IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANITEC WEST, et al. | ) | CASE NO. 1:02 CV 01582 |
| | ) | |
| Plaintiffs, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | PLAINTIFF SANITEC, LTD.'S |
| | ) | NOTICE OF APPEARANCE; AND |
| JOSEPH DELLOIACOVO, et al. | ) | OBJECTION TO NOVEMBER 14, |
| | ) | 2003 "NOTICE OF APPEARANCE" |
| Defendants. | ) | |

Plaintiff Sanitec, Ltd. hereby gives notice to the Court and counsel that it is being

represented in this action by:

> Steven J. Miller (0014293)
> Kimberly Y. Smith (0066849)
> GOODMAN WEISS MILLER LLP
> 100 Erieview Plaza, 27th Floor
> Cleveland, Ohio  44114-1824
> (216) 696-3366 (office)
> (216) 363-5835 (facsimile)
> miller@goodmanweissmiller.com
> smith@goodmanweissmiller.com

who request that they receive copies of all notices and orders, and service of all court filings

and papers.

Furthermore, Sanitec, Ltd. objects to and challenges the "notice of appearance" filed

on November 14, 2003, by attorneys Dan Makee, David Cupar, and Richard Oparil (the

"Harkess Attorneys"), by which they purport to represent plaintiffs Sanitec, Ltd. and A.B.B.

Sanitec West, Inc., as it is apparent that they lack any authority to do so.

The letters recently received by this Court from attorneys Michael Weinsten and Peter Babos reveal that the individuals who engaged Messrs. Makee, Cupar, and Oparil to represent Sanitec West did not have the authority to do so; and the documents attached as exhibits to this Notice confirm that those individuals did not have the authority to hire legal representation for Sanitec, Ltd., either. In short, those letters and documents show that the Harkess Attorneys do not properly represent either plaintiff in this matter.

There is no dispute that Sanitec, Ltd. is owned 100% by Sanitec Worldwide, Ltd., which, in turn, is owned 51% by Windsor Holdings, LLC, and 49% by Salem Associates, Inc. The area of contention lies in the ownership of Windsor Holdings.

On December 16, 2003, following this Court's receipt of the Weinsten and Babos letters, the Harkess Attorneys filed a response to which they attached documents purporting to vest ownership of Windsor Holdings in Mr. James Harkess. Harkess's entire claim to speak on behalf of Sanitec, Ltd. rests on that claimed ownership. In reality, Harkess does not have – nor has he ever had -- any ownership in, or authority regarding, Windsor Holdings; and he therefore has no authority whatsoever to speak on behalf of Sanitec, Ltd.

On May 13, 2002, the (then) sole owner of Windsor Holdings, Mr. Terry Quinn, sent a letter to the (then) acting managing member, Mr. David Kaye, removing him from any and all positions and authority regarding Windsor Holdings. (A copy of the May 13, 2002 Quinn letter appears as Exhibit A attached to this Notice and Objection.) Thereafter, on June 24, 2002, Quinn transferred 100% of the ownership of Windsor Holdings to Windsor Trust, with all authority therefor vested in the appointed trustees, Mr. James H. Smith and Mr. Jeffrey J.

Weinsten. (A copy of the June 24, 2002 Trust Agreement appears as Exhibit B attached to this Notice and Objection.)

In January 2003, Harkess gave sworn testimony at his deposition in this case that he did not know who owned Windsor Holdings. (A copy of the pertinent portions of the January 19, 2003 deposition of James Harkess appears as Exhibit C attached to this Notice and Objection.) Also in January 2003, Kaye -- while not acknowledging Quinn's May 13 letter of termination – gave sworn testimony that he had resigned from his managerial position with Windsor Holdings in the summer of 2002 and that he no longer was aware of who owned the company. (A copy of the pertinent portions of the January 10, 2003 deposition of David Kaye appears as Exhibit D attached to this Notice and Objection.)

Nonetheless, in support of Harkess's current claim of control over Sanitec, Ltd., the Harkess Attorneys have submitted to this Court a copy of a stock certificate purporting to transfer to Harkess "100 membership interests" of Windsor Holdings. That stock certificate is signed by David Kaye as "Manager, President" of Windsor Holdings.

That stock certificate is defective and invalid. The date of the purported transfer by that stock certificate is _November 21, 2002_ – six months _after_ Kaye was removed from management; several months _after_ Kaye resigned from his managerial position, according to his own sworn testimony; and five months _after_ all ownership and control of Windsor Holdings was lawfully transferred to the Windsor Trust. Moreover, _only two months later_, both Kaye and Harkess testifying under oath that _they did not know who owned_ Windsor Holdings.

-3-

The stock certificate offered by the Harkess Attorneys to this Court as proof of Harkess's ownership of Windsor Holdings – and, thereby, his control of Sanitec, Ltd. – is invalid. David Kaye, by his own testimony, had no authority to execute such a certificate in November 2002; and, if such a certificate had been validly executed at that time, why was _neither_ Kaye nor Harkess aware of that fact at his deposition in January 2003?

Perhaps Peter Babos, corporate counsel for Sanitec, Ltd., has summed it up best. In his December 18, 2003 letter to one of the Harkess Attorneys, Babos explained:

> **The assertion that Mr. Harkess owns all of Windsor Holdings is predicated on either a huge mistake, or perhaps certain conduct amounting to fraud.**

(A copy of the December 18, 2003 Babos letter appears as Exhibit E attached to this Notice and Objection.)

Since June 2002, Windsor Holdings has been owned 100% by Windsor Trust, which is controlled solely by its trustees, Smith and Weinsten. David Kaye was divested of all authority in Windsor Holdings as of May 13, 2002; or, by his own admission, at the very latest in the summer of 2002.

At no time was any interest in Windsor Holdings ever conveyed to Harkess. Harkess has no ownership whatsoever in Sanitec, Ltd., has no authority to engage legal representation on behalf of Sanitec, Ltd., and has no authority to enter into any settlement agreement on behalf of Sanitec, Ltd.

For all these reasons, this Court should strike and disregard the "notice of appearance" of Messrs. Makee, Cupar, and Oparil.

Respectfully submitted,

/s/ Steven J. Miller

STEVEN J. MILLER (0014293)

KIMBERLY Y. SMITH (0066849)

100 Erieview Plaza, 27th Floor

Cleveland, OH 44114-1882

Tel. (216) 696-3366 • Fax (216) 363-5835

miller@goodmanweissmiller.com

smith@goodmanweissmiller.com

**Attorneys for Plaintiff Sanitec, Ltd.**

OF COUNSEL:

GOODMAN WEISS MILLER LLP

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2003, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Steven J. Miller
STEVEN J. MILLER

*Terrance Quinn*
*1377 Casiano Road*
*Bel Air, CA 90049*

May 13, 2002

Strategic Financial Advisors
17555 Ventura Boulevard #200
Encino, CA 91316
Attn: David Kaye, President

Dear David,

As part of my planning for the future, I am having a trust created to which I will assign 100% of the ownership of Windsor Holdings, LLC.

In the past, you have occasionally executed certain documents as "Managing Member" of Windsor. This will conflict with the powers of the new trustees of this trust. To avoid any possible confusion, and as the sole member of Windsor Holdings, LLC, I am hereby giving you official notice that as of now you are removed from the office and any role, authority or power you may have once exercised as Managing Member of Windsor Holdings, LLC. I shall now assume this position.

I appreciate your past efforts and support and expect you will continue your work on behalf of Sanitec, Ltd. as it progresses through this very difficult period.

Sincerely yours,

Terrance Quinn

cc: Mary R.
    Jeffrey W.
    Jim S.

**EXHIBIT A**

**THIS TRUST AGREEMENT** made this 24th day of June 2002, between **Terrance Quinn**, residing at 1377 Casiano Drive, Bel Air, CA (the "Settlor") and **Jeffrey J. Weinsten**, residing at 124 Titicus Road, P.O. Box 428, North Salem, NY 10560 and **James H. Smith**, residing at 348 Georgetown Avenue, San Mateo, CA 94402(the "Trustees").

## W I T N E S S E T H:

1.      Trust Property.

In consideration of the premises and covenants herein contained, the Settlor hereby irrevocably grants, conveys, assigns, and sets over to the Trustees the property described in Schedule "A" annexed hereto.  The Trustees are authorized to receive and retain any property whatsoever added to the trust created hereunder, by deed or will of the Settlor or of any other person, it being understood that the property listed in Schedule "A" and any other property added to this trust are sometimes herein called the "Trust Property".  The Settlor hereby relinquishes in his capacity as the Settlor all rights and privileges in the Trust Property.  The Trustees agree to hold, invest, and reinvest the Trust Property, upon the terms herein stated.  The name of this Trust shall be **THE WINDSOR TRUST**.

2.      Contribution for Death Taxes.

Upon the Settlor's death, the Trustees shall pay to the Settlor's estate an amount equal to the Trust's fair share, determined as provided below in this Section 2, of all federal state, estate, inheritance, and other death taxes (including any interest thereon and penalties with respect thereto) imposed by reason of the Settlor's death in respect of the Trust Property held by the Trust or otherwise.  The Trust's fair share of such taxes shall be determined by the executors or administrators of the Settlor's estate for each tax separately and, for each such tax, shall be the proportion of the tax which the value of the Trust Property held by the Trust in respect to which the tax imposed bears to the value of all property in respect to which the tax is imposed.  A tax shall not be considered imposed in respect to property to the extent of any deduction, credit, exemption, or exclusion allowed in respect to such property. The determination by the Settlor's executors or administrators of the amount payable under this Section 2 shall be final, and

**EXHIBIT B**

the Trustees shall pay such amounts without making inquiry into their accuracy.  Upon the payment of the amounts determined, the Trustees shall be discharged from any liability with respect to such payments and from further accountability therefor.  Such payments shall be made out of the corpus of the Trust.  If **Mary Sue Riedinger** survives the Settlor, payments shall be made as defined in Section 4 of this Trust Agreement.

3.    <u>Dispositive Provisions During the Lifetime of the Settlor and at the Settlor's Death</u>.

(a)         Until the death of the Settlor, the Trustees shall:

(i)          Pay the entire net income to the Settlor in convenient installments at least quarter-annually;

(ii)         Pay all or a portion of the corpus of the Trust to the Settlor, at such time or times during the Settlor's life as the Settlor may request in a written instrument delivered to the Trustees; and

(iii)        Pay to or apply for the benefit of the Settlor all or any part of the corpus of the Trust at such time or times during the Settlor's lifetime as the Trustees may, in their sole and uncontrolled discretion, determine to be reasonably necessary for the Settlor's support, maintenance, comfort, or other benefit or to meet the costs of any illness or accident which may affect the Settlor.

(b)         Upon the death of the Settlor, the Trustees shall distribute the then-remaining corpus (which shall include any net income accumulated but not yet distributed), if any, as the Settlor may appoint in favor of his estate or in favor of other beneficiaries, such power to be exercisable by the Settlor in a Will in which he expressly refers to this general power of appointment.

(c)         If or to the extent to which the Settlor fails effectively to exercise the power of appointment granted to him in Section 3(b) of this Trust Agreement to dispose of the corpus (and any accumulated but not distributed income) of this Trust remaining on his death as provided in this Section 3 of this Trust Agreement, the Trustees shall distribute the corpus and

accumulated but not distributed income as provided in Section 4 of this Trust Agreement.

4.        <u>Dispositive Provisions After the Death of the Settlor</u>.

(i)              If the Settlor's spouse, **Mary Sue Riedinger**, survives the Settlor, any property to be disposed of pursuant to Section 3(c) of this Trust Agreement shall be held as follows: the net income together with so much of the trust corpus as the Trustees, in their sole and uncontrolled discretion may determine, shall be paid to or applied for the benefit of the Settlor's said spouse (including the payment of the cost of the Settlor's said spouse's medical care or custodial care at home or at a skilled nursing or health related facility) during her lifetime, in convenient installments annually.

(ii)              Upon the death of the Settlor's said spouse, or upon the Settlor's death, if she predeceases the Settlor, the then existing corpus shall be distributed as the Settlor's spouse shall appoint in her will.

5.        <u>Trustees and Successor Trustees</u>.

In the event of the death or incapacity of **Jeffrey J. Weinsten** prior to the completion of his duties as Trustee under this Trust Agreement, **James H. Smith** shall act as sole Trustee under this Trust Agreement.  In the event of the death or incapacity of **James H. Smith** prior to the completion of her duties as Trustee under this Trust Agreement, **Jeffrey J. Weinsten** shall act as sole Trustee under this Trust Agreement. After the death or incapacity of both of the Trustees hereunder, the Settlor's friend, **Peter Babos**, and the Settlor's friend, **Teresa Layman**, or their survivor, shall act as Co-Successor Trustees under this Trust Agreement.  In addition, if at any time in the administration of the trust created under this Trust Agreement a trust is established for the benefit of a child of the Settlor, that child shall act as an additional Co-Successor Trustee to serve with the Co-Successor Trustees or their survivor.  In the event of the death or incapacity of both **Jeffrey J. Weinsten** and **Jim Smith**, the Settlor's friend, **Peter Babos**, shall act as the Successor Trustee.  Any person then acting as a Trustee other than a child of the Settlor can appoint one or more persons to act as a successor trustee to

3

**Peter Babos**.   One Trustee or Successor Trustee may act for and bind the Trust, provided, however, after the deaths or incapacities of **Jeffrey J. Weinsten** and **James H. Smith**, any investment decision of the Trustee involving a sum in excess of Fifty Thousand ($50,000) Dollars can be made only by a majority of those persons then acting as Trustees.

6.        Approval of Accounts.

         The Trustees shall render an accounting from time to time setting forth the receipts and disbursements of corpus and income and the assets on hand at the commencement and expiration of the accounting.  The written approval of such accounting by the then living beneficiaries shall be final and binding upon all who are then or may thereafter become entitled to any part of the assets, as to all matters and transactions shown in the account.  Nothing herein contained shall preclude the Trustees from submitting an account to a court for settlement.

7.        Spendthrift Provision.

         The interest of any beneficiary in the trust shall not, except as otherwise specifically provided by law, be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void; nor shall any beneficiary be in any manner liable for or subject to the debts, contracts, liabilities, engagements, or torts of the person entitled thereto.  Upon the occurrence or threatened occurrence of any act or thing in violation of or contrary to the foregoing provision, then the interest of any beneficiary in the trust shall cease and terminate, and in that event the Trustees shall hold any payments which would otherwise be payable on account thereof and either make such payments to another beneficiary or add the amount thereof to the corpus of the trust.

8.        Powers of Trustees.

         In addition to the powers granted by law, and except as herein modified, the Trustees shall have the following powers respecting the trust set up hereunder, all to be exercised by them in such manner as they shall, in their sole and uncontrolled discretion, deem advisable without the necessity of

4

applying to any court for leave to exercise the same or for its approval:

     i.           To retain or to sell for cash, on mortgage or credit, to grant options to lease for any term, exchange, mortgage, pledge or otherwise dispose of, to invest and reinvest, all or any part of the Trust Property, real and personal or the proceeds thereof, and the Trustees shall be under no obligation to diversify assets;

     ii.          To acquire stocks, bonds, mortgages or other investments (herein called securities) whether or not they be of the character required by law for the investment of trust funds, including the maintenance of the Trust Assets in one or more bank, brokerage, custodian, or other accounts with any banks, trust companies, or stock brokerage firms, and to pay the costs of maintaining such accounts;

     iii.        To join in or oppose the reorganization, consolidation, merger or readjustment of finances, of any corporation or association whose securities may be held in any such trust and to pay such expenses from corpus with respect thereto as shall be deemed advisable and to consent to or oppose the sale, pledge, mortgage or lease of any property of any corporation or association whose securities may be so held; ·

     iv.        To exercise all rights of ownership over any securities held in such trust, including any conversion privilege or right to subscribe;

     v.        To pay from corpus all assessments, subscriptions and other sums as may seem expedient for the protection of any such trust;

5

vi.        To delegate to proxies, committees, other persons or corporations such powers, duties or discretions as may be deemed to be for the benefit of such trust;

vii.        To settle, litigate, compromise or abandon any claims made either against or on behalf of such trust;

viii.        To deliver or set apart for the purpose of making any division of such trust or of establishing such trust or of making any distribution of the corpus of such trust, any property whatsoever selected for the purpose in lieu of the payment of cash; or to allocate for any such purpose any such property, or partly property and partly cash, either in like proportions or in different proportions with respect to each such division, trust or distributive share;

ix.        To cause any securities to be transferred into or registered in the name of a nominee or the name of the Trustees, with or without the addition of words indicating that the same are held in a fiduciary capacity; and to take and keep any securities unregistered or in such form that they will pass by delivery;

x.        To make any distribution of any share of the income or corpus of such trust to which a minor may become entitled directly to such minor, his guardian, the person with whom he resides, or any custodian under the provisions of the New Jersey Uniform Gifts to Minors Act or any similar legislation, without bond, and the receipt of such minor, guardian, person, or custodian shall be a complete discharge of all obligations of the Trustees with respect to such share of income or corpus;

xi.　　　　To purchase assets from the Settlor or Trustees at a fair value and to make loans, secured or unsecured, with or without interest, to the Settlor or the Trustees or to any corporation or other business entity in which the Settlor or the Trustees had an interest prior to their deaths.  The propriety of any such purchase or loan, the nature and amount thereof, and the ascertainment of fair value shall be solely within the discretion of the Trustees, and the Trustees shall incur no liability as a result of any such purchase or loan.  The Trustees shall have the right to retain any assets so purchased as investments of the trust estate without regard to the proportion which such asset or assets of a similar character, so held, may bear to the entire amount of the Trust Property;

xii.　　　　To borrow money from themselves, from the Settlor or from any person; to issue indebtedness, extend mortgages, encumber trust assets by mortgage, pledge or otherwise, all upon such terms and for such periods (whether or not beyond the term of such trust hereunder) as the Trustees in their discretion shall deem advisable (including the power to borrow for the purpose of the payment of taxes);

xiii.　　　　To maintain bank, brokerage, custodian, or other accounts under the title of **THE WINDSOR TRUST**;

xiv.　　　　To accept property, in the Trustees' discretion, whether acquired by bequest or lifetime transfer, from any person, estate, or trust, notwithstanding that such property may be subject to state or federal estate, transfer, succession, inheritance, or other death taxes and interest or penalties thereon, and to

7

execute such instruments as may be required in connection therewith;

xv.          To merge such trust created hereunder with any other trust or trusts created by Settlor or the Trustees, whether by will or deed as the Trustees in their sole and uncontrolled discretion may deem advisable;

xvi.          To employ accountants, investment counsel, legal counsel, real estate brokers and other agents as the Trustees may deem to be in the best interests of such trust, and to pay any fees or expenses incurred therefore out of corpus or income, all as the Trustees in their sole and uncontrolled discretion shall determine; and

xvii.          To purchase, renew, and maintain life insurance policies or annuity contracts on the life of any beneficiary hereunder or on any person in whom any such beneficiary may have an insurable interest, and to pay premiums thereon out of the trust income or corpus attributable to such beneficiary, all as the Trustees in their sole and uncontrolled discretion shall determine, provided, however, that no trust income shall be used to pay premiums on any policy insuring the life of Settlor during Settlor's lifetime.

9.     <u>Compensation of Trustees</u>.

        The Trustees shall receive no compensation for their services, except that the Trustees shall be permitted to be reimbursed for all expenses.

10.       Bond.

       No Trustee shall be required to furnish any bond, undertaking, or other security for the faithful discharge of his duties as a Trustee, nor shall any Trustee be required to file any interim account of his proceedings in any Court in any jurisdiction in which he may be called upon to act.  No Trustee shall be responsible or liable for the manner in which any discretion is exercised pursuant to this Trust Agreement or for any misinterpretation of this Trust Agreement or for any act or omission of any other Trustee, or unless his conduct amounts to fraud or willful misconduct, for any act or omission of his own.

11.       Irrevocability.

       This Trust Agreement and the Trust hereby created shall be irrevocable by the Settlor at any time and from time to time and either in whole or in part.    This Trust and the Trust Agreement cannot be revoked or amended, and no part of the income or corpus of this Trust can be transferred, pledged, or otherwise alienated by any beneficiary or become subject to the debts of any beneficiary.

12.       Applicable Law.

       This Trust Agreement and the Trust created hereunder shall in all respects be governed by the law of the State of California both as to validity, construction, capacity, performance, and otherwise.

13.       Acceptance of Trust.

       The Trustees accept the Trust herein created upon the terms set forth in this Trust Agreement.

       **IN WITNESS WHEREOF**, the parties have duly executed this Trust Agreement on the date first set out above.

/Terrance Quinn, Settlor

9

Jeffrey J. Weinsten, Trustee


James H. Smith, Trustee

10

Jeffrey J. Weinsten, Trustee


James H. Smith, Trustee

Dec 17 03 11:43p

# SCHEDULE A

100% OF THE SHARES/OWNERSHIP INTEREST IN WINDSOR HOLDINGS, LLC.

1

1       IN THE UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

3       SANITEC WEST, et al.,

4           Plaintiffs,
                            JUDGE NUGENT
5       -vs-            NO. 1-02-01582-DCN

6       JOSEPH DELLOIACOVO, et al.,

7           Defendants.

8             - - - -

9           Deposition of JAMES R. HARKESS, taken as if

10      upon cross-examination before Pamela S.

11      Greenfield, a Registered Diplomate Reporter,

12      Certified Realtime Reporter and Notary Public

13      within and for the State of Ohio, at the offices

14      of Brzytwa, Quick & McCrystal, 900 Skylight

15      Office Tower, 1660 West 2nd Street, Cleveland,

16      Ohio, at 1:30 p.m. on Sunday, January 19, 2003,

17      pursuant to notice and/or stipulations of

18      counsel, on behalf of the Defendants in this

19      cause.

20            - - - -

21          MEHLER & HAGESTROM

**EXHIBIT C**

23  A. Joe Delloiacovo.

24  Q. Anybody else?

25  A. Not that I recall.

36

1  Q. Do you know a gentleman by the name of David

2      Kaye?

3  A. Yes.

4  Q. Do you know whether Mr. Kaye is an employee of

5      Sanitec, Limited?

6  A. Yes.

7  Q. Is he or isn't he?

8  A. Yes.

9  Q. What is your understanding as to what employment

10      Mr. Kaye has with Sanitec, Limited?

11  A. President.

12  Q. And do you know any of the other employees of

13      Sanitec, Limited?

14  A. No.

15  Q. Have you ever heard of a company called Windsor

16      Holdings?

17  A. Yes.

18  Q. Do you know who owns Windsor Holdings?

19  A. No.

20  Q. Have you ever heard of a company called -- strike

21    that.

22      Where did you hear the term Windsor Holdings?

23  A. I don't recall.

24  Q. Have you ever heard of a company called Salem

25    Associates?

37

1  A. Yes.

2  Q. Where did you hear about the company Salem

3    Associates from?

4      MR. GERAGOS:  One moment.

5      - - - -

6    (Thereupon, a discussion was had off

7      the record.)

8      - - - -

9  A. Repeat the question.

10      MR. WALSH:  Perhaps we could have

KAY1[1]

20  Sanitec Limited.  What is the business of Sanitec
21  worldwide?
22      A   Holding company.
23      Q   Do you know who the directors of Sanitec
24  Worldwide are?
25      A   I don't know.

                                                    24

1       Q   Are you a director of Sanitec Worldwide?
2       A   No.
3       Q   Were you ever a director of Sanitec Worldwide?
4       A   No.
5       Q   Were you ever an officer of Sanitec Worldwide?
6       A   No.
7       Q   Do you have any equity interest personally in
8   Sanitec Worldwide?
9       A   No.
10      Q   Does Strategic Financial Advisors have any
11  equity interest in Sanitec Worldwide?
12      A   No.
13      Q   I want to ask you a question -- strike that.
14          I want to ask you some questions about a
15  company or an entity called Windsor Holdings.  Are you
16  familiar with that entity?
17      A   Somewhat.
18      Q   What is your familiarity with Windsor Holdings?
19      A   I believe it is the owner of Worldwide.
20      Q   Is it your understanding that it's the 100
21  percent owner of Worldwide or just that it has some
22  ownership interest in Worldwide?
23      A   I believe it's a majority owner.
24      Q   Does Windsor Holdings conduct any business that

                        Page 21



**EXHIBIT D**

KAY1[1]

25  you're aware of?

25

1      A   I don't know.

2      Q   Do you know if Windsor Holdings is a Delaware

3  entity?

4      A   I don't know.

5      Q   Do you know when Windsor Holdings was formed?

6      A   I don't know.

7      Q   Do you know who the directors of Windsor

8  Holdings are?

9      A   I don't know.

10     Q   Do you know who the officers of Windsor

11  Holdings are?

12     A   I don't know.

13     Q   Are you personally employed by Windsor

14  Holdings?

15     A   No.

16     Q   Have you ever held any management position with

17  Windsor Holdings?

18     A   Briefly.

19     Q   What was that position?

20     A   Managing director.

21     Q   And when was that, if you can recall?

22     A   Summer of 2002.

23     Q   Why are you no longer the managing director of

24  Windsor Holdings?

25     A   I had no interest in continuing.

26

1      Q   Why is that?

2      A   I wasn't getting paid.

3      Q   Can you be any more specific in your

Page 22

KAY1[1]

4   recollection as when you stepped down as managing

5   director of Windsor Holdings other than just summer of

6   2002?

7       A   No.

8       Q   I may have asked you this and, if I did, I

9   apologize; but do you know who owns Windsor Holdings?

10      A   No.

11      Q   Does Strategic Financial Advisors have any

12  equity interest in Windsor Holdings?

13      A   No.

14      Q   Do you personally have any equity in Windsor

15  Holdings?

16      A   No.

17      Q   You said you stepped down because you weren't

18  getting paid. Are you currently owed money by Windsor

19  Holdings?

20      A   No.

21      Q   Do you know who the current managing director

22  is of Windsor Holdings?

23      A   No.

24      Q   I want to move on and ask you some questions

25  about an entity called Salen & Associates. Are you

                                                        27

1   familiar with Salen & Associates?

2       A   Yes.

3       Q   What is Salen & Associates?

4       A   A company.

5       Q   Well, what does Salen & Associates do?

6       A   I don't know.

7       Q   Do you know who owns Salen & Associates?

8       A   No.

                    Page 23

LAW OFFICES OF

# PETER J. BABOS

4640 ADMIRALTY WAY
SUITE 800
MARINA DEL REY, CALIFORNIA 90292
TELEPHONE (310) 577-0014
FACSIMILE (310) 577-0032

PETER J. BABOS
E-MAIL ADDRESS
baboslaw@earthlink.net

BEVERLY HILLS OFFICE
315 SOUTH BEVERLY DRIVE
SUITE 501
BEVERLY HILLS, CALIFORNIA 90212
TEL. (310) 272-0044
FAX (310) 551-1929

December 18, 2003

Mr. Richard J. Oparil, Esq.                        VIA FACSIMILE
Patton Boggs, LLP                                  (703) 744-8001
8484 Westpark Drive
Suite 900
McLean, VA 22102-5117

        Re:  ABB Sanitec West, Inc. and Sanitec, Ltd.

Dear Mr. Oparil:

        I am writing in response to your letter of yesterday's date.  With respect to Sanitec West,
please be advised of the following:

        1)  Since I have now properly corrected a significant mistake in corporate formalities
which wrongfully increased the Board of Directors from 3 to 5 members back in May of this
year, any and all actions by that Board, including the recent purported resolutions promulgated by
Mr. Nord Sorensen, are null and void.

        2)  Once again, as the Secretary and corporate attorney for the corporation, and the only
other individual who participated in the events that then transpired, I can assure you and all
others that there was no true "meeting of the minds" to increase the Board from 3 to 5 members
in the fashion and manner that occurred.  It was procedurally incorrect.  The minutes I adopted
did not reflect the actual agreement and mutual intentions between Dr. Riedinger and Mr.
Harkess.  Moreover, as I have stated previously, it has now become clear to me that Mr. Harkess'
true intentions and motives at that time, and subsequent thereto, were and are self serving and in
conscious disregard of Dr. Mary Riedinger's rights.  Mr. Harkess has substantially breached his
fiduciary duties owed to the proper Shareholders and Directors of the company.

        3)  For the record, other than the natural result arising from events described in
Paragraph 1 above, any action suggested by Mr. Sorensen occurring on December 8 is of no force
and effect.  No proper Board or Shareholder meetings were noticed and called for by Mr.
Sorensen.  In fact, Nord Sorensen has never been appointed, nominated, or elected as an officer
of the corporation.  And as you well know, nor are there any resolutions signed by any persons
other than Mr. Sorensen (unless perhaps Jim Harkess), none of which I have seen.  It is most
disconcerting to see an attorney of your purported caliber relying on such unsupported and
defective evidence

**EXHIBIT E**

Mr. Richard J. Oparil, Esq.
December 18, 2003
Page Two


With respect to Sanitec, Ltd., I advise you of the following:

1)  The assertion that Mr. Harkess owns all of Windsor Holdings is predicated on either a huge mistake, or perhaps certain conduct amounting to fraud.  I think for the sake of preventing grave humiliation and other severe consequences for the party(s) involved, you need to speak to me directly and, I believe, immediately.

2)  My relaying of Sanitec Worldwide information to Mr. Harkess on November 17, 2003 has no bearing on the actual facts relating to the true ownership of Windsor Holdings, LLC.

Notwithstanding all of the above, I wish to remind you that I maintain all corporate books and records of the Sanitec corporations from their very beginning.  Once again, I am personally aware of and have participated in most, if not all, of the events that are presently in dispute.  I would think you would try and take advantage of these facts and inquire further instead of putting yourself and your law firm in a position that may prove irreversible.  Furthermore, it seems apparent now that your firm already has definite conflicts of interest in attempting to represent ABB Sanitec West, Sanitec, Ltd., and Jim Harkess, individually.  The position your firm is currently taking is one that adheres to Mr. Harkess' individual goals and objectives – an attorney role that I believe has definite conflicts vis-a-vis Mary Riedinger and the subject corporate entities.

Finally, by this letter I am also authorizing and instructing Michael E. Weinsten and Steven J. Miller, attorneys for Dr. Mary Riedinger and Sanitec, Ltd., to advise Judge Nugent and any other appropriate parties of the matters contained herein.

Very truly yours,

PETER J. BABOS

pjb:ec
cc:  Mr. Michael E. Weinsten, Esq. (via fax)
     Mr. Steven J. Miller, Esq. (via fax)
     Ms. Mary Riedinger (via fax)