**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **SANITEC WEST, et al.,** | ) **CASE No. 1:02 CV 1582** |
| | ) |
| **Plaintiffs,** | ) **JUDGE DONALD C. NUGENT** |
| | ) |
| **vs.** | ) **BRIEF OF SANITEC LTD. IN** |
| | ) **OPPOSITION TO DECEMBER 19, 2003** |
| **JOSEPH DELLOIACOVO, et al.,** | ) **NOTICE OF APPEARANCE AND** |
| | ) **PLAINTIFFS' CROSS-MOTION TO** |
| **Defendants** | ) **STRIKE WITH MEMORANDUM IN** |
| | ) **SUPPORT** |

On November 14, 2003, Richard J. Oparil and Patton Boggs LLP, and Dan L. Makee, David B. Cupar and McDonald Hopkins, Co., LPA (collectively "Patton Boggs"), entered an appearance as counsel of record for plaintiffs, Sanitec, Ltd. ("Limited") and A.B.B. Sanitec West, Inc. ("West"). (Docket No. 131). A month later, on December 19, 2003, Steven J. Miller and Kimberly Y. Smith of Goodman Weiss Miller LLP (collectively "Goodman") filed a notice of appearance on behalf of Limited and objected to the notice of appearance filed by Patton Boggs. (Docket No. 143).[1] It is undisputed that Limited is owned by Sanitec Worldwide, Ltd. ("Worldwide"), which is in turn owned 51% by Windsor Holdings, LLC ("Windsor") and 49% by Salem Associates, Inc. ("Salem"). Thus, as Goodman states, the "area of contention lies in

---

[1] This Brief is being filed with the Court pursuant to this Court's directive at the Status Conference held on December 19, 2003 (Docket No. 144).

the ownership of Windsor Holdings." (Docket No. 143 at 2). Because the evidence demonstrates that James R. Harkess ("Harkess") owns Windsor, this Court should overrule Goodman's objections and grant Patton Boggs' cross motion to strike Goodman's notice of appearance.

## FACTS

Windsor filed its Articles of Organization as a limited liability company with the State of California on July 17, 2001. (Ex. A, Declaration of David Kaye ("Kaye Decl."), Ex. 1). The Articles of Organization provide that Windsor will be managed by one manager. (*Id.*). On that same day, David Kaye ("Kaye") executed Windsor's Operating Agreement. (Ex. B, Declaration of James Harkess ("Harkess Decl."), Ex. 3). Windsor's Operating Agreement specifies that Kaye is both Manager and original Member of Windsor. (*Id.* at 1, 3). Paragraph 8.2 of Windsor's Operating Agreement provides that "[t]he Manager shall have the right to elect officers of the Company and shall be entitled to elect themselves . . . to any such offices." (*Id.* at 6). Kaye, as Manager and original Member of Windsor, consented to and adopted resolutions wherein Kaye was elected President and Managing Member of Windsor. (Kaye Decl., Ex. 3).

On November 21, 2002, Windsor's Manager Kaye signed a "Resolutions of Manager and Original Member" admitting Harkess as a Member of the company. (Harkess Decl., Ex. 2). Harkess also signed this document. (*Id.*). As noted in the Resolutions above Harkess' signature, the Operating Agreement was attached as an exhibit. (*Id.*). That same day, Kaye also issued a Windsor stock certificate to Harkess, certifying that Harkess is the registered holder of "One Hundred (100) Membership Interest(s)" in Windsor. (Harkess Decl., Ex. 1). Concurrently, pursuant to Section 1.18 of Windsor's Operating Agreement, Kaye withdrew as original Member of Windsor. (Harkess Decl., Ex. 2).

In opposition to this documentary evidence, Goodman claims that a felon, Terrance Quinn (a.k.a. Terry Lee Quatkemeyer) ("Quinn"), was the sole member of Windsor. In support of this assertion, Goodman proffers a letter dated May 13, 2002 from Quinn to Kaye, wherein Quinn acknowledges that Kaye is Managing Member of Windsor, but claims that he, Quinn, is the "sole member" of Windsor. (Docket No. 143, Ex. A). In this letter, Quinn attempts to remove Kaye as Managing Member and appoint himself to this position. (*Id.*). In addition, Goodman proffers a purported June 24, 2002, Trust Agreement whereby Quinn allegedly transfers his 100% alleged interest in Windsor to Windsor Trust. (Docket No. 143, Ex. B). Thus, Goodman argues that Kaye could not have given Harkess any interest in Windsor because Quinn was Windsor's sole member and he fired Kaye as Manager before Kaye issued shares to Harkess.

## <u>ARGUMENT</u>

### I.     CONTROLLING LAW

Harkess was properly made a Member and owner of Windsor. In contrast, there is no evidence that Quinn or Quinn's purported trust owns any shares of Windsor. The organization of Windsor is governed by its Operating Agreement. As a California limited liability company ("LLC"), Windsor is governed by the Beverly-Killea Limited Liability Company Act ("Act"), which provides for the existence of LLCs in California.[2] CAL. CORP. CODE § 17000 *et seq.* Although the Act provides many specific rules for the organization and operation of LLCs, it also provides that most of these provisions can be altered by the articles of organization and/or the operating agreement. Specifically, the Act provides that:

---

[2]     "In matters of internal corporate governance, the law of the state of incorporation will ordinarily govern . . . ." *Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1102 (E.D. Mich. 1997).

> Except as provided in subdivisions (b) and (c), relations among members and between the members and the limited liability company are governed by the articles of organization and operating agreement. To the extent the articles of organization or operating agreement do not otherwise provide, this title governs relations among the members and between the members and the limited liability company.

CAL. CORP. CODE § 17005(a). Subdivision (b) of the statute provides, in relevant part, that:

> The effect of the provisions of this title may be varied as among the members or as between the members and the limited liability company by the articles of organization or operating agreement, provided, however, that the provisions of Sections 17059, 17103, 17104, 17152, 17154, and 17155 may only be varied by the articles of organization or a written operating agreement.

CAL. CORP. CODE § 17005(b). Therefore, Windsor's Articles of Organization and Operating Agreement control the disposition of the issue at hand.

## II.    KAYE WAS A MEMBER AND MANAGER OF WINDSOR.

Under California law, a "Member" of a LLC is a person who:

> (1) Has been admitted to a limited liability company as a member in accordance with the articles of organization or operating agreement, or an assignee of an interest in a limited liability company who has become a member pursuant to Section 17303.

> (2) Has not resigned, withdrawn, or been expelled as a member or, if other than an individual, been dissolved.

CAL. CORP. CODE § 17001(x). As set forth hereinabove, Kaye was named as original Member in Windsor's Operating Agreement. (Harkess Decl., Ex. 3). CAL. CORP. CODE § 5215 (corporate minutes are prima facie evidence of action taken); *Shamel v. Lite Products Sales, Inc.*, 131 Cal. App. 2d 33, 279 P. 2d 1020 (2d Dist. 1955). Accordingly, Kaye was a Member of Windsor, in accordance with Windsor's Operating Agreement and California law.

The California Act also provides that:

> "Manager" means a person elected by the members of a limited liability company to manage the limited liability company if the articles of organization contain the statement referred to in subdivision (b) of Section 17151 or, if the articles of organization do not contain that statement, "manager" means each of the members of the limited liability company.

CAL. CORP. CODE § 17001(w). In compliance with Section 17151(b), Windsor's Articles of Organization provide that Windsor will be managed by one manager. (Kaye Decl., Ex. 1). Kaye was named as Manager in Windsor's Operating Agreement. (Harkess Decl., Ex. 3 at 1, 3). Furthermore, Kaye, as original Member, elected himself Managing Member. (Kaye Decl., Ex. 3). Accordingly, Kaye was a Manager of Windsor, in accordance with Windsor's Operating Agreement and California law.

While Goodman argues that Quinn terminated Kaye as Manager, Quinn had no authority to do so. Paragraph 13.4 of Windsor's Operating Agreement provides that "[t]he Members will have no right to remove any Manager." (Harkess Decl., Ex. 3 at 10). Therefore, Quinn cannot have validly terminated Kaye as Manager of Windsor.

Likewise, Quinn cannot be a Manager of Windsor. Paragraph 14.1 of Windsor's Operating Agreement provides that "[p]ersons may be admitted to the Company as additional or substitute Managers with the consent of the Manager only . . . ." (*Id.* at 11). Accordingly, Quinn could have become a Manager only with the consent of Windsor's Manager, Kaye. Goodman offers no evidence that Kaye consented to Quinn becoming a Manager.[3]

---

[3]    Fed. R. Evid. 609(a)(2) provides that the credibility of a witness may be attacked using evidence of a criminal conviction for dishonesty or false statement. Here, Quinn pled guilty to violating 18 U.S.C. §§ 1014, 2, and 371 -- false statements, aiding and abetting, and conspiracy. (Ex. C). Another individual that Goodman has represented in this Court (Docket No. 110) and may be representing now is Jeffrey J. Weinsten ("Weinsten"), who is a trustee of Quinn's alleged trust and who apparently holds himself out as a vice president of Limited. Quinn also apparently owns Salem. Weinsten was found guilty of violating 18 U.S.C. §§ 1014, 2, and 371, involving a scheme and artifice to defraud the Coast Guard and to obtain money and property from the Coast Guard by false and fraudulent pretenses. *United States v. Jeffrey J. Weinsten*, 96-cr-00702-FB (E.D.N.Y.). (Ex. D). This Court should give no credence to any statements made by Quinn or Weinsten.

Further, James H. Smith, who claims to be Limited's president, is under indictment. (Ex. E).

### III.     HARKESS IS NOW THE SOLE MEMBER OF WINDSOR.

Paragraph 8.1 of Windsor's Operating Agreement provides that the Manager has the "right[] and power[]" "without the consent of any other Member" "[t]o admit new Members into the Company on such terms and conditions as determined by the Manager in its sole discretion[.]" (Harkess Decl., Ex. 3 at 5-6). On November 21, 2002, Windsor's Manager Kaye signed a "Resolutions of Manager and Original Member" admitting Harkess as a Member of Windsor. (Harkess Decl., Ex. 2).

Paragraph 9.2 of Windsor's Operating Agreement provides that the price of Shares is "One Dollar ($1.00) per Share." (Harkess Decl., Ex. 3 at 7). The November 21, 2002 "Resolutions of Manager and Original Member" also states that "Harkess has contributed $100 to the Company in order to purchase 100 shares of the limited liability interests of the Company[.]" (Harkess Decl., Ex. 2). Accordingly, Kaye issued to Harkess a Windsor stock certificate, which "[c]ertifies" that Harkess is the registered holder of "One Hundred (100) Membership Interest(s)" in Windsor. (Harkess Decl., Ex. 1). Also in the November 21, 2002 "Resolutions of Manager and Original Member," pursuant to Section 1.18 of Windsor's Operating Agreement, Kaye withdrew as original Member of Windsor. (Harkess Decl., Ex. 2). No other shares in Windsor had been issued prior to November 2002. (Kaye Decl. ¶5). Accordingly, Harkess became the sole Member of Windsor in November 2002.

### IV.     QUINN IS NEITHER MEMBER NOR MANAGER OF WINDSOR.

In stark contrast, Goodman offers **no evidence** that Quinn was ever a manager or member of Windsor. On January 15, 2004, Goodman produced documents to Patton Boggs supporting Goodman's claim to represent Limited. (Ex. F). None of the documents include any Windsor certificates or resolutions showing Quinn to have ever been a Member of Windsor. Patton Boggs pointed out this deficiency to Goodman (Ex. G), and no additional documents were forthcoming.

Nor did Goodman produce any documents showing Quinn to have ever been Windsor's Manager.

As discussed above, the Manager has sole discretion and authority to admit Members. As further evidence of the Manager's authority, paragraph 4.2 of Windsor's Operating Agreement provides that "[e]ach Member shall be admitted into the Company as a Member for tax, book, accounting, voting and all other purposes on the first day of the month following the month during which the Member's subscription for shares is accepted by the Manager. . . ." (Harkess Decl., Ex. 3 at 4). Goodman has presented no evidence that Windsor's Manager ever accepted any subscription by Quinn for shares in Windsor. To the contrary, Windsor's original Member and Manager, Kaye, has sworn that, to his knowledge, "Windsor never issued any membership interest certificate to [Quinn] or to an alleged trust created by Quinn" and "neither Quinn nor the alleged trust were ever admitted to Windsor as Members." (Kaye Decl. ¶ 8). Thus, Quinn is not a Member of Windsor.

Likewise, Quinn cannot be a Manager of Windsor. Paragraph 14.1 of Windsor's Operating Agreement provides that "[p]ersons may be admitted to the Company as additional or substitute Managers with the consent of the Manager only . . . ." (*Id.* at page 11.) Accordingly, Quinn could have become a Manager only with the consent of Windsor's Manager, Kaye. Goodman offers no evidence that Kaye consented to Quinn becoming a Manager. Therefore, Quinn is neither Member nor Manager of Windsor.

## V.    THE PURPORTED TRANSFER OF SHARES TO QUINN'S TRUST IS INVALID.

With regard to Quinn's purported trust, Quinn could not validly transfer any shares in Windsor via the trust agreement. Paragraph 19.1 of Windsor's Operating Agreement provides that

> Except as provided in Paragraphs 19.4 and 19.8, below, and notwithstanding anything to the contrary contained in the [California Limited Liability Company] Act the Members other than the Managers shall not sell, transfer, assign, pledge, hypothecate, encumber, subject to a security interest, or otherwise dispose ("Transfer") of their Shares, or any part thereof, without first obtaining the consent of the Manager, and any act in violation of this Paragraph 19.1 shall be null and void *ab initio*.

(Harkess Decl., Ex. 3 at 12). Even assuming *arguendo* that Quinn was a Member and owned shares in Windsor, he could not have validly transferred them to the trust without obtaining the consent of Windsor's Manager, Kaye. There is no evidence that such consent was ever sought or obtained. Thus, the alleged transfer to Quinn's trust is void *ab initio*.

## VI.    HARKESS PROPERLY RELIED ON KAYE'S REPRESENTATIONS.

Further, assuming *arguendo* that Quinn was a Member of Windsor and somehow properly removed Kaye as Manager and instituted himself into that position, Kaye was acting with ostensible agency when he admitted Harkess as a Member and issued shares to him. Accordingly, Windsor is still bound by Kaye's transfer of Shares and grant of Membership to Harkess.

Under California law, "[a]n agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal." CAL. CIV. CODE § 2330. Likewise, "[a] principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof." CAL. CIV. CODE § 2334. "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." CAL. CIV. CODE § 2300. "An agent has such authority as the principal, actually or

ostensibly, confers upon him." CAL. CIV. CODE § 2315. "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." CAL. CIV. CODE § 2317. An artificial person, such as a corporation or LLC, can be a principal and can vest others with ostensible agency. *See, e.g., Pacific Ready-Cut Homes, Inc. v. Seeber*, 205 Cal. 690, 272 P. 579 (Cal. 1928).

On the present facts, Windsor as principal intentionally, or by want of ordinary care, caused Harkess to believe that Kaye was its agent. Paragraph 1.14 of Windsor's Operating Agreement provides that "[t]he term 'Manager' means David Kaye[,]" paragraph 8.4 provides that "[a]ny person not a party to this Agreement who shall deal with the Company shall be entitled to rely **conclusively** upon the power and authority of the Manager as set forth herein[,]" and paragraph 13.2 provides that "[a]ll authority to act on behalf of the Company is vested in the Manager." (Harkess Decl., Ex. 3 at 3, 7, and 10, emphasis added). Windsor's Operating Agreement also provides that the Manager has the right "without the consent of any other Member" "[t]o admit new Members into the Company on such terms and conditions as determined by the Manager in its sole discretion[.]" (*Id.* at 5-6). Thus, Windsor, in its Operating Agreement, represented that Kaye was its Manager and that Harkess was entitled to rely upon Kaye's representations.

A copy of Windsor's Operating Agreement was attached as an exhibit to the "Resolutions of Manager and Original Member" admitting Harkess as a Member of the company. (Harkess Decl., Ex. 2). The statement "AGREED AND ACKNOWLEDGED AS TO ADMISSION AS A MEMBER AND ADOPTION OF OPERATING AGREEMENT ATTACHED TO THESE RESOLUTIONS AS EXHIBIT A" appears directly above Harkess' signature on the resolutions document. (*Id.*). Consequently, Harkess was aware of these provisions. Indeed, Harkess has

declared that he "understood and relied on the fact that David Kaye was the Member and Manager of Windsor" in signing the "Resolutions of Manager and Original Member." (Harkess Decl. ¶ 6). In reliance upon Kaye's actual or ostensible authority to transfer Shares to Harkess, Harkess became a Member of Windsor.

Assuming *arguendo* that Quinn was a Member and/or Manager of Windsor and that Quinn mailed the letter proffered by Goodman to Kaye on May 13, 2002 (Docket No. 143, Ex. A), Goodman offers no evidence that Quinn, or anyone acting on his behalf, followed up on this letter to ensure that Kaye was aware that Quinn had allegedly terminated him as Manager. Indeed, Kaye has sworn that he "never received a copy of such a letter" and that he "do[es] not believe that Quinn had authority to terminate [his] position." (Kaye Decl. ¶ 10). Accordingly, Kaye believed that he was still original Member and Manager of Windsor at the time that he admitted Harkess as a Member and issued shares to Harkess. Furthermore, Goodman has not offered any evidence that Quinn ever informed Harkess or any other third-party of any limitation upon Kaye's ability to bind Windsor as Manager. Harkess has declared that he "had no knowledge that Kaye was allegedly terminated as Windsor's Manager" when he signed the "Resolutions of Manager and Original Member" and received 100 Windsor Shares. (Harkess Decl. ¶6). Overall, there is no evidence that Harkess had any reason **not** to rely upon the representations of Kaye's authority that were made in Windsor's Operating Agreement. Accordingly, Harkess's reliance upon Kaye's ostensible authority was in good faith and without want of ordinary care.

In the case of *Seeber,* 272 P. 579, Neese, an individual, presented himself to the public as an agent of Pacific. Neese exhibited signs outside and inside his office and on his cars and used business cards and letter head bearing the name "Pacific Ready-Cut Homes, Inc." Neese also

signed checks for Pacific, and there was a listing in the telephone directory for Pacific that provided contact information for Neese.  Pacific's management apparently warned and ordered Neese not to represent that he was an agent of Pacific.  However, these warnings and orders were "ineffectual," and Pacific did not follow up on them.  *Id.* at 581.  The California Supreme Court found that Pacific was bound by contracts that Neese signed.  *Id.* at 582.

Pacific's warnings are analogous to the letter that Quinn allegedly mailed to Kaye on May 13, 2002.  This letter was also ineffectual in informing Kaye that he allegedly had been removed as Manager, in stopping Kaye from acting as Manager or holding himself out to the public as Manager, or in preventing the public, including Harkess, from relying on Kaye's representations that he was Manager.  On the present facts, this Court should find that Windsor is bound by Kaye's acts.

The California Act itself also supports the binding of Windsor by Kaye's actions.  The Act encourages reliance on the authority of Managers to bind LLCs.  For example, section 17157 provides that:

> Notwithstanding the provisions of subdivision (c) of this section, and subject to the provisions of subdivision (d) of Section 17051, any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between any limited liability company and any other person, when signed by at least two managers (or by one manager in the case of a limited liability company whose articles of organization state that it is managed by only one manager), is not invalidated as to the limited liability company by any lack of authority of the signing managers or manager in the absence of actual knowledge on the part of the other person that the signing managers or manager had no authority to execute the same.

CAL. CORP. CODE § 17157(d).  As discussed hereinabove, Windsor's Articles of Organization state that it is managed by only one manager, with Kaye designated as Manager.

Thus, even assuming *arguendo* that Quinn was a Member of Windsor and somehow properly removed Kaye as Manager and instituted himself into that position, under California law of agency, Windsor is bound by Kaye's admitting Harkess as a Member and by Kaye's issuing Windsor shares to Harkess.

## **CONCLUSION**

For the foregoing reasons, Patton Boggs as attorneys for Limited requests this Court to overrule Goodman's objections to Patton Boggs' notice of appearance and to grant Patton Boggs' cross motion to strike Goodman's notice of appearance.

Respectfully submitted,

_____/s/_____ Dan L. Makee_____
DAN L. MAKEE (0029602)
DAVID B. CUPAR (0071622)
McDonald Hopkins Co., LPA
2100 Bank One Center
600 Superior Avenue, East
Cleveland, Ohio  44114-2643
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474
E-Mail:        dmakee@mcdonaldhopkins.com
                   dcupar@mcdonaldhopkins.com

_____/s/_____ Richard J. Oparil_____
RICHARD J. OPARIL (D.C. Bar No. 409723)
Patton Boggs LLP
2550 M Street, N.W.
Washington, DC  20037-1350
Telephone:  (202) 457-6000
Facsimile:  (202) 457-6315
E-Mail:          roparil@pattonboggs.com

Attorneys for Plaintiffs Sanitec, Ltd. and A.B.B.
Sanitec West, Inc.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing Brief Of Sanitec Ltd. In Opposition to December 19, 2003 "Notice of Appearance" and Plaintiffs' Cross-Motion to Strike With Memorandum In Support was filed electronically with this Court on this 2d day of February, 2004. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,


_____/s/_____Dan L. Makee_____
DAN L. MAKEE (0029602)
DAVID B. CUPAR (0071622)
McDonald Hopkins Co., LPA
2100 Bank One Center
600 Superior Avenue, East
Cleveland, Ohio  44114-2643
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474
E-Mail:        dmakee@mcdonaldhopkins.com
                   dcupar@mcdonaldhopkins.com

Counsel for Plaintiffs

{476507:}