IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANITEC WEST, *et al.*, | ) | CASE NO. 1:02 CV 1582 |
| Plaintiffs, | ) | |
| vs. | ) | JUDGE DONALD C. NUGENT |
| JOSEPH DELLOIACOVO, *et al.*, | ) | |
| Defendants. | ) | DECLARATION OF DAVID KAYE |

David Kaye deposes and states as follows:

1. I make this declaration based on my personal knowledge and I am competent to testify to the facts set forth herein.

2. On or about July 17, 2001, Windsor Holdings, LLC ("Windsor"), a California limited liability corporation, was incorporated. Attached as Ex. 1 is a true and correct copy of Windsor's Certificate of Incorporation.

3. Peter Babos ("Babos"), a California attorney, drafted Windsor's Operating Agreement, which names me as Manager and original Member of Windsor. A true and correct copy of that document, which I signed on or about July 17, 2001, is attached as Ex. 2.

4. Babos also drafted the Written Consent of Manager and Member, in which I was elected President and Managing Member of Windsor on or about July 17, 2001. A true and correct copy of that document is attached as Ex. 3.

5. Prior to November 2002, no shares in Windsor had been issued.

6. On or about November 21, 2002, I signed a Resolution of Windsor, adopted by written consent, withdrawing as original Member of Windsor and admitting James Harkess

EXHIBIT A

("Harkess") as new Member of Windsor. This document was also drafted by Babos. A true and correct copy of this document is attached as Ex. 4.

7. On or about November 21, 2002, a certificate for 100 membership interests of Windsor were issued to Harkess. Babos prepared the certificate, which I signed as Windsor's Manager and President. A true and correct copy of the share certificate is attached as Ex. 5. The share certificate was then provided to Harkess.

8. To the best of my knowledge as Windsor's original Member and Manager, Windsor never issued any membership interest certificate to Terry Quinn aka Terrance Lee Quatkemeyer ("Quinn") or to an alleged trust created by Quinn. Further, neither Quinn nor the alleged trust were ever admitted to Windsor as Members.

9. To the best of my knowledge, information and belief, Harkess continues to own his membership interest in Windsor.

10. I understand that there have been allegations that in May 2003, Quinn sent a letter terminating me as Windsor's Manager. I never received a copy of such a letter. Further, I do not believe that Quinn had authority to terminate my position.

I make the foregoing declaration under penalty of perjury.

January 31, 2004

_____
David Kaye

#3749779

- 2 -

# EXHIBIT 1

Case 1:02-cv-00132-SSB-TSH  Document 99-4  Filed 02/06/2004  Page 3 of 11

# State of California



## SECRETARY OF STATE

I, *BILL JONES*, Secretary of State of the State of California, hereby certify:

That the attached transcript of __1__ page(s) has been compared with the record on file in this office, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF,** I execute this certificate and affix the Great Seal of the State of California this day of

JUL 1 9 2001

*Bill Jones*

Secretary of State

Sec/State Form CE-107 (rev. 9/98)

OSP 01 55358

S-PB000001



## State of California
## Bill Jones
### Secretary of State

### LIMITED LIABILITY COMPANY
### ARTICLES OF ORGANIZATION

A $70.00 filing fee must accompany this form.
IMPORTANT – Read instructions before completing this form.

File# 200120010070

**ENDORSED - FILED**
in the office of the Secretary of State
of the State of California

JUL 17 2001

BILL JONES, Secretary of State

This Space For Filing Use Only

1. Name of the limited liability company (end the name with the words "Limited Liability Company," " Ltd. Liability Co.," or the abbreviations "LLC" or "L.L.C.")
   Windsor Holdings, LLC

2. The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea limited liability company act.

3. Name the agent for service of process and check the appropriate provision below:
   Mitchell R. Miller _____ which is
   [X] an individual residing in California. Proceed to item 4.
   [ ] a corporation which has filed a certificate pursuant to section 1505. Proceed to item 5.

4. If an individual, California address of the agent for service of process:
   Address: 315 South Becerly Drive, Suite 501
   City: Beverly Hills    State: CA    Zip Code: 90212

5. The limited liability company will be managed by: (check one)
   [X] one manager  [ ] more than one manager  [ ] single member limited liability company  [ ] all limited liability company members

6. Other matters to be included in this certificate may be set forth on separate attached pages and are made a part of this certificate. Other matters may include the latest date on which the limited liability company is to dissolve.

7. Number of pages attached, if any:

8. Type of business of the limited liability company. (For informational purposes only)
   Investments

9. DECLARATION: It is hereby declared that I am the person who executed this instrument, which execution is my act and deed.

   _/s/ Mitchell R. Miller_
   Signature of Organizer

   Mitchell R. Miller
   Type or Print Name of Organizer

   July 13, 2001
   Date

10. RETURN TO:
    NAME    Mitchell R. Miller, Attorney at Law
    FIRM    315 South Beverly Drive, Suite 501
    ADDRESS Beverly Hills, CA 90212
    CITY/STATE
    ZIP CODE

SEC/STATE (REV. 12/99)

FORM LLC-1 – FILING FEE $70.00
Approved by Secretary of State

S-PB000002

# EXHIBIT 2

# OPERATING AGREEMENT
## OF
## WINDSOR HOLDINGS, LLC

THIS OPERATING AGREEMENT of Windsor Holdings, LLC (this "Agreement") is made as of this 17th day of July, 2001 by and among David Kaye, an individual ("Kaye"), as the "Manager," Kaye as the original Member (the "Original Member"), and Windsor Holdings, LLC, a California limited liability company. The parties hereto agree as follows:

(a) **DEFINITIONS.** The following terms shall have the following meanings in this Agreement:

1.1 The term "Act" means the California Limited Liability Company Act as now in effect and as hereafter amended or revised.

1.2 The term "Affiliate" means, when used with reference to a specified person:

(a) the principal of the person;

(b) any person directly or indirectly controlling, controlled by or under common control with such person;

(c) any person owning or controlling ten percent (10%) or more of the outstanding voting interests of such person; and

(d) any successor-in-interest following a merger or similar transfer when such successor-in-interest is owned by the same persons who own such person; and

(e) any relative or spouse of such person.

1.3 The term "Agreement" means this Operating Agreement of Windsor Holdings, LLC, as originally executed and as amended from time to time, as the context requires.

1.4 The term "Articles" means the articles of organization filed with the California Secretary of State for the purpose of forming the Company, in the form prescribed by the Act and the California Secretary of State.

1.5 The term "Cash Available For Distribution" includes any cash received by the Company attributable to the operations of the Company, including proceeds of insurance to compensate for covered losses, less the sum of:

(a) Company debt service;

(b) Current operating expenditures;

---

"NO SHARES REPRESENTED BY THIS AGREEMENT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), OR QUALIFIED UNDER ANY STATE SECURITIES LAW, IN RELIANCE UPON EXEMPTIONS FOR SALES NOT INVOLVING ANY PUBLIC OFFERING AND UPON THE REPRESENTATION THAT SUCH SHARES WILL NOT BE TRANSFERRED UNLESS AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE MANAGER IS SUPPLIED TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED."

S-P30000003

(c)     a reasonable reserve for the operation of the business of the Company, as determined by the Manager.

1.6     The term "Capital Account" means the account established for each Manager and Member pursuant to Treas. Reg. §1.7041(b)(2)(iv). Each Manager's and Member's Capital Account shall be maintained in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended (the "Code"), and Treas. Reg. §1.704-1(b)(2)(iv). The following rules shall apply:

(a)     Each Manager's or Member's Capital Account shall be credited with (i) the amount of money contributed by such Manager and Member to the Company, (ii) the Gross Asset Value of property (other than cash) contributed by such Manager or Member to the Company, (iii) Operating Profits and any items of income and gain specially allocable to such Manager or Member, and (iv) the amount of any Company liability assumed by such Manager of Member or which is secured by any Company property distributed to such Manager or Member.

(b)     Each Manager's or Member's Capital Account shall be debited by (i) the amount of distributions of Available Cash From Operations made to such Manager or Member, (ii) the Gross Asset Value of property distributed to such Manager or Member by the Company, (iii) Operating Losses and any items of deductions and losses specially allocable to such Manager and Member, and (iv) the amount of any liabilities of such Manager of Member assumed by the Company or which are secured by any property contributed by such Manager or Member to the Company.

(c)     The amount of any liability determined under Paragraph 1.6(a) hereof or this Paragraph 1.6(c) shall be determined by taking into account Section 752(c) of the Code and other applicable provisions of the Code and the Regulations thereunder.

(d)     Provided any such modifications do not adversely affect the rights of any Manager or Member, the Manager is hereby authorized to modify from time to time the method by which such Capital Accounts are maintained in order to comply with the requirements of the Code and the regulations promulgated thereunder. Unless a termination of the Company occurs under Section 708(b)(1)(B) of the Code, if a Manager or Member transfers his, her or its interests in the Company, the transferee, including any Economic Interest Holder, will succeed to the transferor's Capital Account.

1.7     The term "Code" means the Internal Revenue Code of 1986, as amended (or any corresponding provision or provisions of any succeeding law).

1.8     The term "Company" means Windsor Holdings, LLC, a California limited liability company.

1.9     The terms "Cumulative Operating Profits" and "Cumulative Operating Losses" mean the respective difference, measured from the commencement of the Company to the end of the applicable period of computation, between:

(a)     the sum of the aggregate respective Operating Profits of the Company (or specified items thereof, as the case may be); and

(b)     the sum of the aggregate respective Operating Losses of the Company (or specified items thereof, as the case may be).

1.10    The term "Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset of the Company for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

S-PB000004

1.11    The term "Economic Interest" means a person's right to share in the Operating Profits, Operating Losses or similar items, and to receive distributions of Cash Available For Distribution from the Company, but does not include any other rights of a Member, including, without limitation, the right to vote or to participate in the management of the Company.

1.12    The term "Gross Asset Value" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Manager or Member to the Company shall be the gross fair market value of such asset, as determined by the contributing person and the Manager, provided that, if the contributing person is a Manager the determination of the fair market value of a contributed asset shall be determined by appraisal or agreement of the Members;

(b)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (i) the acquisition of an additional Share in the Company (other than pursuant to Paragraph 9 hereof) by any new or existing Manager or Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Manager or Member of more than a de minimis amount of Company property as consideration for a Share; and (iii) the liquidation of the Company within the meaning of Treas. Reg. §1.704-1(b)(2)(ii)(g); provided, however, that the adjustments pursuant to clauses (i) and (ii) hereof shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Manager and Members in the Company;

(c)    The Gross Asset Value of any Company asset distributed to any Manager or Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Manager provided that, if the distributee is a Manager, the determination of the fair market value of the distributed asset shall be determined by appraisal or agreement of the Members; and

(d)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treas. Reg. §1.704-1(b)(2)(iv)(m) and Paragraph 1.6 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Paragraph 1.12(d) to the extent the Manager determines that an adjustment pursuant to Paragraph 1.12(b) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Paragraph 1.12(d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Paragraph 1.12(a), 1.12(b) or 1.12(d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Operating Profits and Operating Losses.

1.13    The term "Majority in Interest of the Members," unless otherwise provided in the Agreement, means more than fifty percent (50%) of the interests of the Members in the current profits of the Company.

1.14    The term "Manager" means David Kaye, an individual, or any other duly elected Manager.

1.15    The term "Manager/Member Non-Recourse Debt" has the meaning set forth in Treas. Reg. §1.704-2(b)(4).

1.16    The term "Manager/Member Non-Recourse Debt Minimum Gain" means an amount, with respect to each Manager or Member Non-Recourse Debt, equal to the Company Minimum Gain that would result if such Manager or Member Non-Recourse Debt were treated as a Non-Recourse Liability, determined in accordance with Treas. Reg. §1.704-2(i)(3).

1.17    The term "Manager/Member Non-Recourse Deductions" has the meaning set forth in Treas. Reg. §§1.704-2(i)(1) and 1.704-2(i)(2).

S-PB000005

1.18    The term "Member" means a person who:

(a)    has been admitted to the Company as a Member in accordance with this Agreement, or an assignee of a Member, other than an Economic Interest Holder, who has become a Member pursuant to Paragraph 19 hereof; and

(b)    has not resigned, withdrawn or been expelled as a Member or, if other than an individual, been dissolved.

The term "Member" does not include the Manager or David Kaye, the Original Member, except to the extent the Manager or David Kaye purchases shares. The Original Member shall withdraw from the Company upon admission of the first Member.

1.19    The term "Non-Recourse Deductions" has the meaning set forth in Treas. Reg. §1.704-2(b)(1).

1.20    The term " Non-Recourse Liability" has the meaning set forth in Treas. Reg. §1.704-2(b)(3).

1.21    The terms "Operating Profits" and "Operating Losses" mean, with respect to any period of time, the net income for federal income tax purposes or net loss for federal income tax purposes of the Company.

1.22    The term "Participation Percentage" means the percentages for each Member derived by dividing the total number of shares issued to each Member pursuant to Paragraph 9 hereof by the sum of all shares owned by all Members.

1.23    The term "Shares" means the right of a Member to allocations of Operating Profits and Operating Losses and to distributions of Cash Available for Distribution, to vote on matters as provided in this Agreement, and to receive information on the Company.

2.    FORMATION.

The Members hereby organize the Company as a limited liability company pursuant to the provisions of the Act and the rights, duties, and liabilities of the Members shall be as provided in the Act, except as otherwise expressly stated in this Agreement. The Manager shall prepare, execute and cause the Articles to be filed with the California Secretary of State. If the Manager deems it to be in the best interests of the Company, the Manager shall cause a certified copy of the Articles to be recorded in the office of the recorder in each county in each state in which the Company hereafter holds title to real property or hereafter establishes a place of business. In addition, the Manager shall cause to be filed with the California Secretary of State, on the prescribed form, a statement containing the information required pursuant to the Act to be so filed.

3.    NAME.

The name of the Company shall be "Windsor Holdings, LLC."

4.    COMMENCEMENT; ADMISSION OF MEMBERS.

4.1    The Company shall commence its existence on the date upon which the Articles are duly filed with the California Secretary of State under the Act and shall continue its existence until it is dissolved pursuant to the provisions of the Act or this Agreement.

4.2    Each Member shall be admitted into the Company as a Member for tax, book, accounting, voting and all other purposes on the first day of the month following the month during which the Member's subscription for shares is accepted by the Manager, unless the Manager in its discretion selects a different admission policy that is reasonable and consistent with applicable law and regulation. As soon as practicable after the execution of this

Agreement with respect to each new Member, the Manager shall issue a certificate of membership to each Member acknowledging his, her or its status as a Member.

5. STATUTORY AGENT FOR SERVICE OF PROCESS; PRINCIPAL EXECUTIVE OFFICE.

5.1 The initial statutory agent for the service of process and the initial principal office shall be that person and location set forth in the Articles as filed with the California Secretary of State. The Manager may, from time to time, change the statutory agent or registered office through appropriate filings with the California Secretary of State. In the event the statutory agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement statutory agent or file a notice of change of address, as the case may be, in accordance with the Act.

5.2 The principal executive office of the Company shall be at 17555 Ventura Boulevard, Suite 200, Encino, California 91316 or such other place as the Manager may from time to time designate.

6. TERM.

Unless earlier terminated as provided in this Agreement, the Company shall continue until December 31, 2032.

7. PURPOSES.

The Company is formed for the following purposes:

7.1 To purchase, lease, develop, design, distribute, own, operate, or otherwise engage in or own interests in companies that engage in the management and operation of medical waste facilities, and related businesses (collectively the "Business").

7.2 The entering into, performing and carrying out of contracts of any kind necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company.

7.3 The doing of any and all acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of the business, objectives, and purposes set forth herein.

8. POWERS, RIGHTS AND DUTIES OF THE MANAGER.

8.1 Subject to the provisions of Paragraph 8.3 and the other applicable provisions of this Agreement, the Manager shall have the full, exclusive and complete authority and discretion in the management and control of the business of the Company for the purposes stated herein and shall have the right to make any and all decisions affecting the business of the Company. Subject to the provisions of this Agreement, the Manager, on behalf of the Company, shall have full and exclusive authority to execute and acknowledge any and all contracts, agreements, licenses and other documents, and to make withdrawals from Company checking, savings and similar accounts. Without limiting the generality of the foregoing, the Manager shall have the following rights and powers which it may exercise at the cost, expense and risk of the Company, without the consent of any other Member:

(a) To expend the capital and income of the Company, if any, in the furtherance of the Company's Business, which includes, but is not limited to, causing the Company to pay compensation to, and to reimburse expenses incurred by, persons providing services to the Company, including but not limited to the Manager and its Affiliates;

(b) To execute and deliver all documents and instruments in connection with the financing, design, development, operation, management, ownership, marketing and disposition of the Business;

(c) To execute and deliver assignments, licenses and other transfers and conveyances in connection with the Company's properties and operations;