IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANITEC WEST, *et al.*, | ) | CASE NO. 1:02 CV 1582 |
| Plaintiffs, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| vs. | ) | |
| JOSEPH DELLOIACOVO, *et al.*, | ) | |
| Defendants. | ) | DECLARATION OF JAMES HARKESS |

James Harkess deposes and says:

1. I have personal knowledge of the facts set forth in this declaration and am competent to testify thereto.

2. I was deposed in this action by defendants' counsel on January 19 and 27, 2003. I was not provided a copy of my transcripts to review and correct by plaintiffs' former counsel, Climaco, Lefkowitz, Peca, Wilcox & Garofoli, or anyone else.

3. On December 19, 2003, I was informed that a law firm purporting to represent Sanitec, Ltd., Goodman Weiss Miller LLP, filed a portion of my January 19, 2003 transcript pertaining to Windsor Holdings LLC as part of its claim that it represents Sanitec, Ltd. ("Limited"). I understand that transcript states that I testified that I did not know who owned Windsor.

4. That testimony was mistaken. On or about November 21, 2002, I received a stock certificate showing that I owned 100 membership interests (*i.e.*, shares) of Windsor, which represents a 100% ownership interest in that company. A true and correct copy of that certificate is attached as Ex. 1.

**EXHIBIT B**

- 2 -

5.  Also on or about November 21, 2002, I signed an acknowledgement that I was admitted as a member of Windsor, subject to the provision of Windsor's Operating Agreement. A true and correct copy of those documents are attached as Exs. 2 and 3.

6.  In signing the acknowledgement and receiving the Windsor shares, I understood and relied on the fact that David Kaye was the Member and Manager of Windsor. At that time I had no knowledge that Kaye was allegedly terminated as Windsor's Manager.

7.  Thus, as of November 2002, I was a member of Windsor and any later deposition testimony was a mistake. Had I been given the opportunity to review and correct the January 19, 2003 deposition transcript, I would have corrected the mistake. I also should point out that this litigation, and the deposition, was not focused on the issue of Windsor's ownership.

8.  Limited is 100% owned by Sanitec Worldwide, Ltd., which in turn is owned 51% by Windsor and 49% by Salem Associates, Inc. ("Salem"). Salem is owned by Jeffrey Weinsten ("Weinsten").

9.  To the best of my knowledge, information and belief, David Kaye is President of Limited. Mr. Kaye retained the firm Patton Boggs LLP to represent Limited in this litigation. I also retained Patton Boggs LLP to represent the co-plaintiff, A.B.B. Sanitec West, Inc. The firm Goodman Weiss Miller does not represent either plaintiff in this case.

10. Attached as Ex. 4 is a true and correct copy of a November 15, 1999 memorandum I sent to Terry Quinn.

11. Attached as Ex. 5 is a true and correct copy of a September 11, 2002 letter I received from David Kaye as President of Sanitec, Ltd.

12. Attached as Ex. 6 is a true and correct copy of September 17, 2003 e-mails between myself and Peter J. Babos, Esq.

- 3 -

13. Attached as Ex. 7 is a true and correct copy of a November 17, 2003 fax with attachments from Peter J. Babos, Esq.

14. On or about January 23, 2003, I caused A.B.B. Sanitec West, Inc. to loan $60,000 to Salem and Weinsten to pay a retainer to Goodman Weiss Miller LLP. Salem and Weinsten pledged to me or my designee ownership interest in Sanitec, Ltd. That loan has not been repaid. A true and correct copy of that agreement, signed by Salem, Weinsten, Steven J. Miller, Esq., Sanitec West and John R. Climaco, Esq., is attached as Ex. 8.

I make the foregoing declaration under penalty of perjury.

January 29th, 2004

_____
James Harkess

#3749836

# EXHIBIT 1

S-PB000027



# EXHIBIT 2

## RESOLUTIONS OF MANAGER AND ORIGINAL MEMBER OF
## WINDSOR HOLDINGS, LLC
## A CALIFORNIA LIMITED LIABILITY COMPANY
## ADOPTED BY UNANIMOUS WRITTEN CONSENT
## OF THE MANAGER AND ORIGINAL MEMBER

The undersigned, being the Manager and Original Member of Windsor Holdings, LLC ("Company"), a limited liability company organized under the laws of the State of California, consent to and adopt the following resolutions as the action of the Company in lieu of a formal, as permitted in the California Limited Liability Company Act and Section 13.4 of the Operating Agreement adopted under this Consent.

### ADMISSION OF NEW MEMBER

**WHEREAS**, Mr. James R. Harkess has contributed $100 to the Company in order to purchase 100 shares of the limited liability interests of the Company, effective November 21, 2002.

**RESOLVED**, that Mr. James R. Harkess is hereby admitted as a Member of the Company, effective November 21, 2002, and will own 100% of the Members' total Participation Percentages upon withdrawal of the Original Member from the Company.

### WITHDRAWAL OF ORIGINAL MEMBER

**WHEREAS**, Section 1.18 of the Company's Operating Agreement, a copy of which is attached to these resolutions as Exhibit A, states that the Original Member of the Company will withdraw from the Company upon admission of the first Member of the Company.

**RESOLVED**, that Mr. David Kaye, the Original Member of the Company, hereby withdraws as a Member of the Company, effective November 21, 2002.

This Unanimous Written Consent of the Manager and Original Member may be executed by the Member and the Original Manager in any number of counterparts, all of which when executed and delivered shall have the force and effect of an original, and shall be effective as of November 21, 2002.

MANAGER:

_____
David Kaye

ORIGINAL MEMBER:

_____
David Kaye

AGREED AND ACKNOWLEDGED AS TO ADMISSION
AS A MEMBER AND ADOPTION OF OPERATING AGREEMENT
ATTACHED TO THESE RESOLUTIONS AS EXHIBIT A:

_____
James R. Harkess

C:\315 Hard Drive\PJB FILES\client files\Windsor Holdings\WindsorMin.doc      -1-

S-PB000026

# EXHIBIT 3

# OPERATING AGREEMENT
# OF
# WINDSOR HOLDINGS, LLC

THIS OPERATING AGREEMENT of Windsor Holdings, LLC (this "Agreement") is made as of this 17th day of July, 2001 by and among David Kaye, an individual ("Kaye"), as the "Manager," Kaye as the original Member (the "Original Member"), and Windsor Holdings, LLC, a California limited liability company. The parties hereto agree as follows:

    (a)    DEFINITIONS. The following terms shall have the following meanings in this Agreement:

    1.1    The term "Act" means the California Limited Liability Company Act as now in effect and as hereafter amended or revised.

    1.2    The term "Affiliate" means, when used with reference to a specified person:

    (a)    the principal of the person;

    (b)    any person directly or indirectly controlling, controlled by or under common control with such person;

    (c)    any person owning or controlling ten percent (10%) or more of the outstanding voting interests of such person; and

    (d)    any successor-in-interest following a merger or similar transfer when such successor-in-interest is owned by the same persons who own such person; and

    (e)    any relative or spouse of such person.

    1.3    The term "Agreement" means this Operating Agreement of Windsor Holdings, LLC, as originally executed and as amended from time to time, as the context requires.

    1.4    The term "Articles" means the articles of organization filed with the California Secretary of State for the purpose of forming the Company, in the form prescribed by the Act and the California Secretary of State.

    1.5    The term "Cash Available For Distribution" includes any cash received by the Company attributable to the operations of the Company, including proceeds of insurance to compensate for covered losses, less the sum of:

    (a)    Company debt service;

    (b)    Current operating expenditures;

---

"NO SHARES REPRESENTED BY THIS AGREEMENT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), OR QUALIFIED UNDER ANY STATE SECURITIES LAW, IN RELIANCE UPON EXEMPTIONS FOR SALES NOT INVOLVING ANY PUBLIC OFFERING AND UPON THE REPRESENTATION THAT SUCH SHARES WILL NOT BE TRANSFERRED UNLESS AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE MANAGER IS SUPPLIED TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED."

    (c)    a reasonable reserve for the operation of the business of the Company, as determined by the Manager.

1.6    The term "Capital Account" means the account established for each Manager and Member pursuant to Treas. Reg. §1.7041(b)(2)(iv). Each Manager's and Member's Capital Account shall be maintained in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended (the "Code"), and Treas. Reg. §1.704-1(b)(2)(iv). The following rules shall apply:

    (a)    Each Manager's or Member's Capital Account shall be credited with (i) the amount of money contributed by such Manager and Member to the Company, (ii) the Gross Asset Value of property (other than cash) contributed by such Manager or Member to the Company, (iii) Operating Profits and any items of income and gain specially allocable to such Manager or Member, and (iv) the amount of any Company liability assumed by such Manager of Member or which is secured by any Company property distributed to such Manager or Member.

    (b)    Each Manager's or Member's Capital Account shall be debited by (i) the amount of distributions of Available Cash From Operations made to such Manager or Member, (ii) the Gross Asset Value of property distributed to such Manager or Member by the Company, (iii) Operating Losses and any items of deductions and losses specially allocable to such Manager and Member, and (iv) the amount of any liabilities of such Manager of Member assumed by the Company or which are secured by any property contributed by such Manager or Member to the Company.

    (c)    The amount of any liability determined under Paragraph 1.6(a) hereof or this Paragraph 1.6(c) shall be determined by taking into account Section 752(c) of the Code and other applicable provisions of the Code and the Regulations thereunder.

    (d)    Provided any such modifications do not adversely affect the rights of any Manager or Member, the Manager is hereby authorized to modify from time to time the method by which such Capital Accounts are maintained in order to comply with the requirements of the Code and the regulations promulgated thereunder. Unless a termination of the Company occurs under Section 708(b)(1)(B) of the Code, if a Manager or Member transfers his, her or its interests in the Company, the transferee, including any Economic Interest Holder, will succeed to the transferor's Capital Account.

1.7    The term "Code" means the Internal Revenue Code of 1986, as amended (or any corresponding provision or provisions of any succeeding law).

1.8    The term "Company" means Windsor Holdings, LLC, a California limited liability company.

1.9    The terms "Cumulative Operating Profits" and "Cumulative Operating Losses" mean the respective difference, measured from the commencement of the Company to the end of the applicable period of computation, between:

    (a)    the sum of the aggregate respective Operating Profits of the Company (or specified items thereof, as the case may be); and

    (b)    the sum of the aggregate respective Operating Losses of the Company (or specified items thereof, as the case may be).

1.10    The term "Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset of the Company for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

S-PB000004

1.11    The term "Economic Interest" means a person's right to share in the Operating Profits, Operating Losses or similar items, and to receive distributions of Cash Available For Distribution from the Company, but does not include any other rights of a Member, including, without limitation, the right to vote or to participate in the management of the Company.

1.12    The term "Gross Asset Value" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Manager or Member to the Company shall be the gross fair market value of such asset, as determined by the contributing person and the Manager, provided that, if the contributing person is a Manager the determination of the fair market value of a contributed asset shall be determined by appraisal or agreement of the Members;

(b)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (i) the acquisition of an additional Share in the Company (other than pursuant to Paragraph 9 hereof) by any new or existing Manager or Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Manager or Member of more than a de minimis amount of Company property as consideration for a Share; and (iii) the liquidation of the Company within the meaning of Treas. Reg. §1.704-1(b)(2)(ii)(g); provided, however, that the adjustments pursuant to clauses (i) and (ii) hereof shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Manager and Members in the Company;

(c)    The Gross Asset Value of any Company asset distributed to any Manager or Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Manager provided that, if the distributee is a Manager, the determination of the fair market value of the distributed asset shall be determined by appraisal or agreement of the Members; and

(d)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treas. Reg. §1.704-1(b)(2)(iv)(m) and Paragraph 1.6 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Paragraph 1.12(d) to the extent the Manager determines that an adjustment pursuant to Paragraph 1.12(b) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Paragraph 1.12(d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Paragraph 1.12(a), 1.12(b) or 1.12(d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Operating Profits and Operating Losses.

1.13    The term "Majority in Interest of the Members," unless otherwise provided in the Agreement, means more than fifty percent (50%) of the interests of the Members in the current profits of the Company.

1.14    The term "Manager" means David Kaye, an individual, or any other duly elected Manager.

1.15    The term "Manager/Member Non-Recourse Debt" has the meaning set forth in Treas. Reg. §1.704-2(b)(4).

1.16    The term "Manager/Member Non-Recourse Debt Minimum Gain" means an amount, with respect to each Manager or Member Non-Recourse Debt, equal to the Company Minimum Gain that would result if such Manager or Member Non-Recourse Debt were treated as a Non-Recourse Liability, determined in accordance with Treas. Reg. §1.704-2(i)(3).

1.17    The term "Manager/Member Non-Recourse Deductions" has the meaning set forth in Treas. Reg. §§1.704-2(i)(1) and 1.704-2(i)(2).

S-PB000005