1.18    The term "Member" means a person who:

(a)    has been admitted to the Company as a Member in accordance with this Agreement, or an assignee of a Member, other than an Economic Interest Holder, who has become a Member pursuant to Paragraph 19 hereof; and

(b)    has not resigned, withdrawn or been expelled as a Member or, if other than an individual, been dissolved.

The term "Member" does not include the Manager or David Kaye, the Original Member, except to the extent the Manager or David Kaye purchases shares. The Original Member shall withdraw from the Company upon admission of the first Member.

1.19    The term "Non-Recourse Deductions" has the meaning set forth in Treas. Reg. §1.704-2(b)(1).

1.20    The term " Non-Recourse Liability" has the meaning set forth in Treas. Reg. §1.704-2(b)(3).

1.21    The terms "Operating Profits" and "Operating Losses" mean, with respect to any period of time, the net income for federal income tax purposes or net loss for federal income tax purposes of the Company.

1.22    The term "Participation Percentage" means the percentages for each Member derived by dividing the total number of shares issued to each Member pursuant to Paragraph 9 hereof by the sum of all shares owned by all Members.

1.23    The term "Shares" means the right of a Member to allocations of Operating Profits and Operating Losses and to distributions of Cash Available for Distribution, to vote on matters as provided in this Agreement, and to receive information on the Company.

2.    FORMATION.

The Members hereby organize the Company as a limited liability company pursuant to the provisions of the Act and the rights, duties, and liabilities of the Members shall be as provided in the Act, except as otherwise expressly stated in this Agreement. The Manager shall prepare, execute and cause the Articles to be filed with the California Secretary of State. If the Manager deems it to be in the best interests of the Company, the Manager shall cause a certified copy of the Articles to be recorded in the office of the recorder in each county in each state in which the Company hereafter holds title to real property or hereafter establishes a place of business. In addition, the Manager shall cause to be filed with the California Secretary of State, on the prescribed form, a statement containing the information required pursuant to the Act to be so filed.

3.    NAME.

The name of the Company shall be "Windsor Holdings, LLC."

4.    COMMENCEMENT; ADMISSION OF MEMBERS.

4.1    The Company shall commence its existence on the date upon which the Articles are duly filed with the California Secretary of State under the Act and shall continue its existence until it is dissolved pursuant to the provisions of the Act or this Agreement.

4.2    Each Member shall be admitted into the Company as a Member for tax, book, accounting, voting and all other purposes on the first day of the month following the month during which the Member's subscription for shares is accepted by the Manager, unless the Manager in its discretion selects a different admission policy that is reasonable and consistent with applicable law and regulation. As soon as practicable after the execution of this

-4-

S-P3000006

Agreement with respect to each new Member, the Manager shall issue a certificate of membership to each Member acknowledging his, her or its status as a Member.

5.    STATUTORY AGENT FOR SERVICE OF PROCESS; PRINCIPAL EXECUTIVE OFFICE.

5.1    The initial statutory agent for the service of process and the initial principal office shall be that person and location set forth in the Articles as filed with the California Secretary of State. The Manager may, from time to time, change the statutory agent or registered office through appropriate filings with the California Secretary of State. In the event the statutory agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement statutory agent or file a notice of change of address, as the case may be, in accordance with the Act.

5.2    The principal executive office of the Company shall be at 17555 Ventura Boulevard, Suite 200, Encino, California 91316 or such other place as the Manager may from time to time designate.

6.    TERM.

Unless earlier terminated as provided in this Agreement, the Company shall continue until December 31, 2032.

7.    PURPOSES.

The Company is formed for the following purposes:

7.1    To purchase, lease, develop, design, distribute, own, operate, or otherwise engage in or own interests in companies that engage in the management and operation of medical waste facilities, and related businesses (collectively the "Business").

7.2    The entering into, performing and carrying out of contracts of any kind necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company.

7.3    The doing of any and all acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of the business, objectives, and purposes set forth herein.

8.    POWERS, RIGHTS AND DUTIES OF THE MANAGER.

8.1    Subject to the provisions of Paragraph 8.3 and the other applicable provisions of this Agreement, the Manager shall have the full, exclusive and complete authority and discretion in the management and control of the business of the Company for the purposes stated herein and shall have the right to make any and all decisions affecting the business of the Company. Subject to the provisions of this Agreement, the Manager, on behalf of the Company, shall have full and exclusive authority to execute and acknowledge any and all contracts, agreements, licenses and other documents, and to make withdrawals from Company checking, savings and similar accounts. Without limiting the generality of the foregoing, the Manager shall have the following rights and powers which it may exercise at the cost, expense and risk of the Company, without the consent of any other Member:

(a)    To expend the capital and income of the Company, if any, in the furtherance of the Company's Business, which includes, but is not limited to, causing the Company to pay compensation to, and to reimburse expenses incurred by, persons providing services to the Company, including but not limited to the Manager and its Affiliates;

(b)    To execute and deliver all documents and instruments in connection with the financing, design, development, operation, management, ownership, marketing and disposition of the Business;

(c)    To execute and deliver assignments, licenses and other transfers and conveyances in connection with the Company's properties and operations;

S-PB000007

(d)    To cause the Company to incur borrowings and to execute and deliver promissory notes, checks, drafts, and other negotiable instruments on behalf of the Company;

(e)    To hire on behalf of the Company such employees, independent contractors and personnel as the Manager deems necessary or appropriate in order to conduct the Company's business, including but not limited to Affiliates of the Manager;

(f)    To employ such attorneys, accountants and other persons, subject to the terms otherwise stated herein, as the Manager deems necessary or advisable to carry out the purposes of the Company;

(g)    To purchase from or through others, contracts of liability, casualty and other insurance which the Manager deems advisable, appropriate, convenient or beneficial to the Company;

(h)    To invest Company funds in government securities, certificates of deposit, banker's acceptances or similar investments;

(i)    To enter into such agreements and contracts with such parties and to give such receipts, releases and discharges with respect to all of the foregoing and any matters incident thereto as the Manager deems advisable, appropriate or convenient;

(j)    To delegate all or any of its duties hereunder, and in furtherance of any such delegation, to appoint, employ, or contract with any person deemed in its discretion necessary or desirable for the transaction of the business of the Company, including persons, firms or entities (i) which employ or are affiliated with or subject to the control of the Manager, and (ii) in which it has a proprietary interest. Such persons may, under the supervision of the Manager, (i) administer the day-to-day operations of the Company, (ii) serve as the Company's advisors and consultants in connection with policy decisions made by the Manager, (iii) act as consultants, accountants, correspondents, attorneys, brokers, escrow agents, or in any other capacity deemed by the Manager necessary or desirable, (iv) perform or assist in the performance of administrative or managerial functions necessary for the management of the Company, and (v) perform such other acts or services for the Company as the Manager in its sole and absolute discretion may approve;

(k)    To admit new Members into the Company on such terms and conditions as determined by the Manager in its sole discretion;

(l)    To cause the Company to raise additional capital and issue more Shares or other securities from time to time without limit; and

(m)    To execute and deliver any and all other instruments to carry out the purposes hereof.

8.2    The Manager shall possess and may enjoy and exercise all of the rights and powers of members and managers as provided by the Act, except to the extent any of such rights may be limited or restricted by the express provisions of this Agreement. The Manager shall devote such time to the Company and its business as shall be necessary to conduct the Company business, to operate and manage the Company in an efficient manner and to carry out the Manager's responsibilities as herein provided. The Manager shall have the right to elect officers of the Company and shall be entitled to elect themselves or others, including Affiliates, to any such offices.

8.3    Notwithstanding the provisions of this Paragraph 8, neither the Manager nor any Member shall have any right, power or authority to:

(a)    Do any act in contravention of this Agreement without first obtaining the written consent thereto of a Majority in Interest of the Members.

(b)    Possess Company property, or assign the Company's right in such property, for other than a Company purpose without first obtaining the written consent thereto of a Majority in Interest of the Members.

(c)    Admit a person as an additional manager other than an Affiliate of the Manager, without first

S-PB000008

obtaining the written consent of a Majority in Interest of the Members.

(d)    Amend this Agreement without first obtaining the written consent thereto of a Majority in Interest of the Members, unless the amendment is ministerial.

8.4    Any person not a party to this Agreement who shall deal with the Company shall be entitled to rely conclusively upon the power and authority of the Manager as set forth herein.

8.5    The Company shall reimburse the Manager for all out-of-pocket expenses and an allocable portion of indirect overhead expenses incurred by the Manager in conducting the Company's business, and all direct and indirect disbursements to third parties made and obligations incurred on behalf of the Company to third parties, including items such as the Company's legal expenses and other costs and expenses incurred in the operation of the Company's business. The Manager and its Affiliates may earn compensation in connection with the Company's Business, and may provide other services to the Company from time to time and shall be entitled to receive compensation for such services; provided, that such compensation may not exceed the amount which would be payable to an unaffiliated party for similar services in the same geographic area.

8.6    Either Manager by his signature alone has the power to execute checks, drafts, and other negotiable instruments on behalf of the Company. Both Managers must sign in order to bind the Company and the Manager to any contracts or documents with respect to the Business and to consent on behalf of the Manager under this Agreement. In the event that a substitute or new manager is admitted into the Company in the future, then it shall be presumed that only the remaining original Manager or Managers will have the authority to bind the Company on his own and that new managers will not have that authority unless expressly granted that authority in a writing signed by both original Managers, or by a duly adopted amendment to this Agreement.

9.    CAPITAL CONTRIBUTIONS.

9.1    The Manager may but shall not be obligated to contribute capital to the Company other than an initial capital contribution of $100 in cash made upon the formation of the Company. Any capital contributions made by the Manager for the purchase of Shares (not including the initial $100 cash capital contribution) and by the other Members pursuant to Paragraph 9.2 hereof shall be referred to as the "Capital Contributions."

9.2    The Members shall make an aggregate Capital Contribution to the Company in the amount determined by the Manager, at a price of One Dollar ($1.00) per Share. Concurrently with the execution and delivery to the Manager of the Subscription Agreement, each Member shall deliver in cash to the Manager the amount of his, her or its respective Capital Contribution, all as set forth on the Subscription Agreement for each such Member.

9.3    Subject to the provisions of Paragraph 12.3 below, no Member shall be personally liable for any obligations or debts of the Company or any of its losses beyond the total amount the Member has agreed to contribute to the capital of the Company and to the Member's share, if any, of the undistributed Cash Available For Distribution attributable to the Member. Except as provided in Paragraph 9, and in Par. 12.3 below, no Member shall have any obligation to make an additional Capital Contribution to the Company.

9.4    Except as specifically provided in this Agreement, no Member shall be entitled to interest on his, her or its Capital Contributions.

10.    ADVANCES.

10.1    If any funds are required by the Company for the operation of its business in excess of the Capital Contributions made by the Members required pursuant to Paragraph 9 above and loans obtained from third parties, then any Member and Manager shall have the right, but not the obligation, upon the approval of the Manager, to advance such funds (the "Advances") to the Company.

10.2    If any Manager or Member makes an Advance pursuant to Paragraph 10.1 above, such Advance shall constitute an unsecured loan to the Company.

S-PE000009

10.3    The terms and conditions of an Advance by any Member or Manager shall be determined by the Manager pursuant to its best business judgment. The Advance shall be evidenced by a promissory note and shall be repaid to the Member or Manager making the Advance pursuant to Paragraph 12 of this Agreement.

10.4    If any Member or Manager lends money to the Company for any purpose, whether as an Advance or otherwise, in connection with such loan the Member or Manager shall be deemed an unsecured creditor of the Company, and not a Member, for the purpose of determining his, her or its right and priority to the payment of interest on and the repayment of the principal of such loan.

11.    PROFITS AND LOSSES.

11.1    Subject to Paragraph 11.3 hereof, Operating Losses of the Company shall be allocated first, in accordance with previously allocated Operating Profits, and then, 100% to the Members.

11.2    Subject to Paragraph 11.3 hereof, Operating Profits shall be allocated among the Manager and Members in accordance with distributions of Cash Available for Distribution pursuant to Paragraphs 12.2(b) and 12.2(c) of this Agreement or, in the absence of distributions of Cash Available for Distribution, 100% to the Members pro rata in accordance with their relative participation percentages.

11.3    No allocation of Operating Profits and Operating Losses shall be made under Paragraphs 11.1 or 11.2 hereof without compliance with the following:

(a)    Notwithstanding anything contained in this Paragraph 11 to the contrary, if there is a net decrease in "Minimum Gain," as such term is defined in Paragraph 11.3(b) hereof, for any Company taxable year, each Member shall be allocated items of Company income and gain for such year in accordance with Treas. Reg. §§1.704-2(f), (g) and (j).

(b)    "Minimum Gain" with respect to any taxable year of the Company means the minimum gain of the Company computed strictly in accordance with the principles of Treas. Reg. §1.704-2(f), (g) and (j). Subject to the previous sentence, "Minimum Gain" means the sum, for all Company assets, of the amounts of taxable income or gain that would be realized if each such asset were disposed of for an amount equal to the nonrecourse liabilities (as defined under Treas. Reg. §1.704-2(b)) ("Non-Recourse Liabilities") secured by such assets. For this purpose, where any such asset is subject to multiple Non-Recourse Liabilities of unequal priority, the adjusted basis of such asset shall be allocated among such Non-Recourse Liabilities in order of priority from most senior first to least senior last. Where two or more Non-Recourse Liabilities are of equal priority, basis shall be allocated among such Non-Recourse Liabilities pro rata in proportion to the outstanding balances of such Non-Recourse Liabilities.

(c)    Notwithstanding anything contained in this Paragraph 11 to the contrary, if any Member unexpectedly receives an allocation or distribution described below, and such allocation or distribution causes or increases a deficit balance in such Member's Capital Account, such Member shall be allocated items of income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year) in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. The allocations and distributions referred to in the preceding sentence are the following:

(i)    Any allocations of Operating Losses or other deductions that, as of the end of such year, reasonably are expected to be made to such Member pursuant to Sections 704(e)(2) and 706(d) of the Code, or pursuant to Treas. Reg. §1.7511(b)(2)(ii).

(ii)    Any distributions that, as of the end of such year, reasonably are expected to be made to such Member to the extent they exceed offsetting increases to such Member's Capital Account that reasonably are expected to occur during (or prior to) the Company taxable years in which such distributions reasonably are expected to be made (other than increases pursuant to the Minimum Gain chargeback provided in Paragraph 11.3(a) hereof).

The provisions of this Paragraph 11.3(c) are intended to be a "Qualified Income Offset" within the

-8-

S-PBC00010

meaning of Treas. Reg. §1.7041(b)(2)(ii)(d). In the event of any conflict between this Paragraph 11.3(c) and those Regulations, the Regulations shall prevail.

(d)    Any Operating Losses or other expenditures of the Company under Section 705(a)(2)(B) of the Code, attributable to a loan made by a Member to the Company for which such lending Member bears the "economic risk of loss," as that term is defined in Treas. Reg. §1.704-1T(b)(4)(iv)(k)(1), shall be allocated to such lending Member.

(e)    Non-Recourse Deductions for any taxable year shall be specially allocated to the Manager and Members.

(f)    Any Manager/Member Non-Recourse Deductions for any taxable year shall be specially allocated to the Manager or Member who bears the economic risk of loss with respect to the Manager/Member Non-Recourse Debt to which such Manager/Member Non-Recourse Deductions are attributable in accordance with Treas. Reg. '1.704-2(2)(i)(1).

(g)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or Section 743(b) of the Code is required, pursuant to Treas. Reg. §1.704-1(b)(2)(iv)(m)(2) or Treas. Reg. §1.704-1(b)(2)(iv)(m) (4), to be taken into account in determining Capital Accounts as the result of a distribution to a Manager or Member in complete liquidation of his, her or its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment decreases the basis of the asset) and such gain or loss shall be specially allocated to the Manager and Members in accordance with their interests in the Company in the event that Treas. Reg. §1.704-1(b)(2)(iv)(m)(2) applies, or to the Managers and Members to whom such distribution was made in the event that Treas. Reg. §1.704-1(b)(2)(iv)(m)(4) applies.

(h)    Syndication expenses for any taxable year shall be specially allocated to the Members in proportion to their relative Capital Contributions.

(i)    In the event that any Member contributes property other than cash to the Company, all allocations of Operating Profits, Operating Losses and items thereof shall be made in accordance with the principles of Section 704(c) of the Code.

(j)    Any special allocation of items of Company income, gain, loss or deduction to a Member ("Special Allocations") shall be taken into account in computing subsequent allocations of Operating Profits and Operating Losses to such Member in such a manner that the net amount of all such Special Allocations and allocated Operating Profits and Operating Losses shall equal the amount of Operating Profits and Operating Losses computed as if such Special Allocations had not been required, that would have been allocated to such Member if such Special Allocations had not been made.

12.    DISTRIBUTIONS BY THE COMPANY.

12.1    Subject to all of the provisions of this Agreement, Cash Available For Distribution shall be distributed to the Manager and Members at such times and in such amounts as are determined in the sole and absolute discretion of the Manager.

12.2    Cash Available For Distribution shall be distributed as follows:

(a)    First, to any Manager or Member, the amount then due on any Advances, payable to each Manager or Member in the same ratio as the amount of the Advances bears to the aggregate amount (including interest thereon) of unpaid Advances outstanding to the Manager and all Members at the time of such distribution.

(b)    Second, 100% to the Members, pro rata in accordance with their respective participation percentages in the Company.

12.3    Notwithstanding anything contained in this Agreement to the contrary, Members are liable to return any Company distributions of cash or other assets, with interest, if, immediately following such distribution, the

S-PB000011

liabilities of the Company, other than liabilities to Members on account of their interest in the Company and liabilities as to which recourse of creditors is limited to specified property of the Company, exceed the fair saleable value of the assets of the Company, not including those assets which are subject to liabilities as to which recourse of creditors is limited, except to the extent to which the fair saleable value of such assets exceeds the liabilities to which they are subject.

        12.4     No Member shall have the right to demand and receive property other than cash upon any distribution from the Company, including, without limitation, distributions upon dissolution of the Company. Each Member waives any such right he, she or it may have to distributions other than cash pursuant to the Act.

        12.5     No distribution of Cash Available For Distribution shall be made until the allocations described in Paragraph 11 hereof have first been made and, thereafter, distributions of Cash Available For Distribution shall be made first. Liquidating distributions pursuant to Paragraph 21.3 hereof shall be made after taking into account all Capital Account adjustments for the taxable year during which such liquidation occurs (other than adjustments from liquidating distributions) and the effect of a deficit balance in any Manager's Capital Account, and shall be made by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation).

13.     RIGHTS AND OBLIGATIONS OF THE MEMBERS.

     .   13.1     Except as expressly provided in this Agreement to the contrary, the Members (excluding a Manager who is also a Member) shall take no part in the operation, management or control of the Company's business.

        13.2     The Members (excluding a Manager who is also a Member) shall have no power to sign for or to bind the Company. All authority to act on behalf of the Company is vested in the Manager. Any Member who takes any action to bind the Company in contravention of this Agreement shall indemnify the Company for any costs, expenses, claims or liabilities incurred by the Company as a result of the unauthorized action of such Member. Without limiting the foregoing, the exercise by a Member of any rights granted by this Agreement, or serving as a third-party contractor, consultant or surety of the Company, shall not be deemed to be taking part in the execution, management or control of the Company's business.

        13.3     Subject to the provisions of Paragraph 12.3 of this Agreement, Members shall not be personally liable for any obligations or debts of the Company or any of its losses beyond the total amount the Members have agreed to contribute to the capital of the Company and to the Members' share, if any, of the undistributed Cash Available For Distribution attributable to the Members.

        13.4     The Members are entitled to vote, either at a meeting or by written consent, prior to any such action being taken, to do any of the following, subject to Paragraph 8.3 of this Agreement:

        (a)     Approve any act which would be in contravention to this Agreement.

        (b)     Approve the possessing of Company property, or the assignment of the Company's right in such property, for other than a Company purpose.

        (c)     Approve any nonministerial amendment to this Agreement or the Articles. The Manager may make ministerial amendments to this Agreement without the approval of any other Members.

        (d)     Approve the merger, reorganization or dissolution and winding up of the Company.

        (e)     Where there is no remaining Manager, elect to continue the business of the Company.

        (f)     Where there is no remaining Manager, admit a Manager or elect to continue the business of the Company.

     The matters specified in Paragraphs 13.4(a) through (d) above, also requires the concurrence of the Manager. Approval of the matters set forth in Paragraphs 13.4(a) through (f) requires the approval of at least a Majority in Interest of the Members. The Members will have no right to remove any Manager. In the case of any other matter

S-P0000012

with respect to which the Members are entitled to vote under this Agreement, action shall be taken if approved by the Manager and a Majority in Interest of the Members. Except as provided in this Paragraph 13.4 or elsewhere in this Agreement, no Member shall have the right to vote on any matter affecting the Company's business.

13.5    Meetings of the Members may be called either by the Manager or by Members holding at least 50% of the Participation Percentages. Any Member may obtain from the Manager, at any time, a list of the names and addresses of all the Members. At any meeting of the Members, the presence in person or by proxy of a Majority in Interest of the Members shall constitute a quorum. A meeting of the Members may be called for voting on any matter upon which the Members are entitled to vote. The Company is not obligated to have meetings of the Shareholders unless called by the Manager or the Shareholders in accordance with the terms of Section 13.5 of this Agreement.

14.    ADDITIONAL MANAGERS; WITHDRAWAL

14.1    Persons may be admitted to the Company as additional or substitute Managers with the consent of the Manager only, and without the consent of any other Member.

14.2    Any Manager shall have the right to withdraw or resign from the Company upon 90 days prior written notice to the Members.

15.    AMENDMENTS.

15.1    Amendments may be made to this Agreement from time to time with the consent of the Members as provided in Paragraph 13.4(c) above or, if the amendment is ministerial, by the Manager without the consent of any other Member.

15.2    In making amendments, there shall be prepared and filed by the Manager, such documents, amendments, certificates and statements as shall be required to be prepared and filed pursuant to the Act and under the laws of the other jurisdictions in which the Company owns property or is required to file.

15.3    The consent of the Manager to any amendment to this Agreement shall be deemed approved by the Manager if executed by it.

16.    INSURANCE.

The Company may procure liability insurance (or shall be designated as an additional insured, if appropriate) which will protect it from liability to others because of personal injury (including death) and property damage which may arise from operations under this Agreement, and such other insurance as is customary, desirable or required for the conduct of the Company's business, as determined by the Manager in its sole discretion.

17.    FISCAL YEAR, BOOKS AND RECORDS AND BANK ACCOUNTS.

17.1    The Company, for accounting and income tax purposes, shall operate on a fiscal year coincident with the calendar year and shall utilize such accounting principles and income tax elections and determinations as shall be determined by the Manager. The Manager shall serve as the "Tax Matters Partner" for the Company.

17.2    The books and records of, and other information pertaining to, the Company shall be available for inspection, audit, and copying by any Member (or holder of an Economic Interest) or his representatives during normal business hours at the principal executive office of the Company set forth in Paragraph 5.2 of this Agreement. Such books, records and other information shall include:

(a)    a then current list of the full name and last-known business, residence or mailing address of each Member, set forth in alphabetical order, together with such person's Capital Contribution and share of Operating Profits, Operating Losses and Cash Available For Distribution.

(b)    a copy of the initial Articles and all amendments thereto, together with executed copies of any

S-PB000013