**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   **No.** |
| | ) |
| | ) |
| **DAVID G. BARFORD,** | ) |
| **KENT D. KALKWARF,** | ) |
| **DAVID L. McCALL and** | ) |
| **JAMES H. SMITH, III,** | ) |
| | ) |
| **Defendants.** | ) |

**INDICTMENT**

The Grand Jury charges that, at times relevant to the indictment:

**INTRODUCTION**

1.     Charter Communications, Inc., (hereinafter "Charter") was headquartered in Town and Country, Missouri, within the Eastern District of Missouri. Charter provided cable television services and high speed Internet access to over 6 million subscribers in 40 states. Charter's stock was publicly traded on the National Association of Securities Dealers' Automated Quotation System (NASDAQ), an electronic trading system. Charter had shareholders throughout the United States, including in the Eastern District of Missouri.

2.     Defendant David G. Barford ("Barford") was Charter's Executive Vice-President and Chief Operating Officer.

# EXHIBIT E

3.      Defendant Kent D. Kalkwarf ("Kalkwarf") was Charter's Executive Vice-President and Chief Financial Officer.

4.      Defendant David L. McCall ("McCall") was Charter's Senior Vice-President of Operations in charge of the Eastern Division.

5.      Defendant James H. Smith, III ("Smith") was Charter's Senior Vice-President of Operations in charge of the Western Division.

6.      On September 21, 2001, the Chief Executive Officer of Charter resigned. He was replaced by a new Chief Executive Officer on October 9, 2001. During the three intervening weeks, Barford and Kalkwarf assumed the responsibilities of Chief Executive Officer.

7.      As a result of their employment at Charter, Barford, Kalkwarf, McCall and Smith were all provided substantial compensation packages that included salaries, bonuses, stock options and forgivable loans. Barford, Kalkwarf and McCall held significant interests in Charter stock.

8.      As a publicly traded company, Charter was required to comply with the Securities Act of 1933, the Securities Exchange Act of 1934 and the regulations of the United States Securities and Exchange Commission (the "SEC"). These laws and regulations were designed to protect the investing public by ensuring that publicly traded companies like Charter fairly, accurately and timely report their financial results and condition. To ensure fair, accurate and timely reports to the investing public, the securities laws and the SEC regulations required Charter and its directors and officers to, among other things:

> (a)      make and keep books, records and accounts which in reasonable detail accurately and fairly reflect Charter's transactions and dispositions of assets;

-2-

(b)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the company's transactions were executed in accordance with management's policies and recorded as necessary to permit preparation of reliable financial statements in accordance with applicable accounting norms;

(c)     file regular public reports including quarterly reports (Form 10Q), current reports (Form 8K) and annual reports (Form 10K) with the SEC; and

(d)     make fair and accurate representations to auditors preparing public reports of Charter, including all material facts necessary to make management's representations to auditors not misleading.

9.     From August 2000 through March 2002, Charter filed regular financial reports with the SEC. During this entire period, Arthur Andersen LLP, which was at the time a public accounting firm, served as the outside auditors of Charter's financial reports.

10.     Charter announced its operating results and projections for future performance on a quarterly basis in press releases and conference calls with cable industry stock analysts. Executives and employees of Charter also regularly communicated with stock analysts regarding such information. These analysts relied on three primary indicators when evaluating the value of the stock of a cable television company such as Charter: operating cash flow, revenue and subscriber growth. Management at Charter viewed success in meeting stock analysts' expectations and Charter's projections for these three indicators as critical to determining its stock price.

11.     Operating cash flow is an accounting term which Charter defined as profit before subtracting interest on debt, taxes, depreciation, amortization and stock-based compensation costs.

12.     Revenue is the amount of proceeds received from the sales of services to customers and from advertising before subtracting any expenses.

13.     Subscriber growth or internal subscriber growth refers to the percentage of growth in subscribers to Charter's cable services resulting from sales and marketing efforts.

## THE 2000 SET-TOP BOX REVENUE AND OPERATING CASH FLOW ENHANCEMENT SCHEME

### Background

14.     A digital set-top box is a piece of equipment that is placed on a subscriber's television which allows the subscriber to receive and view digital television. Charter purchases set-top boxes and supplies them to its customers to permit access to Charter's cable television programs.

15.     Supplier 1 and Supplier 2 sold digital set-top boxes to Charter. Each had entered into long term contracts to sell hundreds of thousands of set-top boxes to Charter prior to August 2000.

16.     In or about August 2000, Kalkwarf and Barford realized that Charter's 2000 year end operating cash flow would be lower than projected by Charter and the stock analysts who covered Charter. In an effort to generate approximately 15 to 20 million dollars in additional revenue needed to meet these cash flow projections, Barford directed a senior level employee at

Charter to solicit advertising business from some of Charter's largest suppliers, including set-top box Suppliers 1 and 2. Initially, these suppliers declined to purchase advertising from Charter.

**The Scheme**

17.    Beginning in or about August 2000 and continuing through on or about February 11, 2001, Kalkwarf and Barford knowingly devised and intended to devise a scheme to defraud investors in Charter securities and the investing public of money and property by means of materially false and fraudulent pretenses, representations and promises, by falsely inflating Charter's publicly reported year end revenue and operating cash flow and by making false statements relating to the inflated revenue and operating cash flow, in order to inflate artificially Charter's stock price, and to deprive Charter and its stockholders of their material and intangible rights to the defendants' and other employees' honest services. The honest services of which the defendants schemed to deprive Charter and its stockholders included:

  (a) the duty to conduct the business of the corporation in an honest fashion;

  (b) the duty to report corporate financial and operational results accurately and fairly; and

  (c) the duty to utilize the financial and human resources of the corporation for the best interests of the stockholders.

18.    It was part of the scheme that in or about August 2000, Barford and Kalkwarf agreed to offer Charter funds to Suppliers 1 and 2 so that they could then use those same funds to purchase advertising from Charter at no cost to the suppliers. Barford and Kalkwarf decided to offer these suppliers an additional $20 for each set-top box Charter purchased if these suppliers would agree to return that money to Charter by buying advertising in an equal dollar amount. In

these transactions, there would be no real economic benefits to either of these suppliers or to
Charter. Charter would pay $20 more than necessary for each set-top box but then receive that
same $20 back as advertising revenue. Barford and Kalkwarf's purpose in engaging in this
scheme was to increase fraudulently Charter's revenue and operating cash flow because Charter
would recognize $20 per set-top box as advertising revenue when, in effect, no revenues would
be generated because Charter would be using its own funds to purchase the advertising from
itself.

19.    It was also part of the scheme that acting under the direction of Barford and
Kalkwarf, a senior level employee approached individuals at Supplier 1 and Supplier 2 and
obtained their agreement to participate in this proposed transaction to overcharge Charter $20 per
set-top box and then return the overcharge payments to Charter by buying advertising during the
fourth quarter of 2000.

20.    It was also part of the scheme that in or about August 2000, Kalkwarf met with
representatives from Arthur Andersen to discuss the proposed transactions. Although Charter
already had long term contracts to purchase set-top boxes at established prices with Supplier 1
and Supplier 2, Kalkwarf falsely told the Arthur Andersen representatives that Charter was then
negotiating to try to get long term contracts with these two vendors and that Charter would have
to pay a premium for the set-top boxes to get a long term contract. Kalkwarf also falsely claimed
to Arthur Andersen that Supplier 1 and Supplier 2 had approached Charter with the idea of
purchasing advertising from Charter.

21.    It was also part of the scheme that even with the false statements made by
Kalkwarf, Arthur Andersen told Kalkwarf that the transactions appeared to be interrelated, and,
therefore, Charter would not be able to recognize any advertising payments from these suppliers

-6-

as revenue. When asked if there were circumstances that would allow the advertising dollars to be recognized as revenue, Arthur Andersen explained that the two transactions (that is, the additional payments for the set-top boxes and the advertising contracts) would each have to be at fair market value, unrelated to each other and negotiated at least a month apart. Kalkwarf then falsely claimed Charter would try to arrange the transactions in that fashion.

22.    It was also part of the scheme that during the last half of August 2000 and after the meeting with Arthur Andersen, Kalkwarf falsely told the same senior level Charter employee that Arthur Andersen had approved the transaction in order to alleviate concerns the senior level employee had previously raised.

23.    It was also part of the scheme that in order to conceal the true nature of the transaction from Arthur Andersen, both Kalkwarf and Barford instructed the senior level employee to generate separate contracts for the set-top box price increase and for the purchase of advertising by each supplier. The senior level employee communicated this information to Suppliers 1 and 2.

24.    It was also part of the scheme that in or about late August 2000 and a few days after the meeting between Kalkwarf and Arthur Andersen, Kalkwarf told an Arthur Andersen representative that Charter would be negotiating the advertising and set-top box contracts separately and that the contracts would be executed 30 days apart, when in fact, Kalkwarf knew that the senior level employee was negotiating both the advertising and set-top box contracts with Supplier 1 and Supplier 2 at the same time.

25.    It was also part of the scheme that during much of September 2000, the senior level employee, pursuant to instructions from Barford and Kalkwarf, negotiated the set-top box

price increase and advertising transactions at the same time. Although the set-top box price increase contracts were not finalized with either vendor until late September, the contracts were both backdated to late August giving the false appearance that the set-top box price increase agreements were negotiated a month before the advertising contracts which were dated in late September.

26.    It was also part of the scheme that in or about late September 2000, Kalkwarf falsely told the Arthur Andersen representative that Charter had negotiated the advertising contracts and the set-top box price agreements separately and that two different departments within Charter negotiated the contracts independently when, in fact, the senior level employee conducted the negotiations of the advertising and set-top boxes at the same time.

27.    It was also part of the scheme that during the fourth quarter of 2000, Charter overpaid approximately $17,000,000 to Suppliers 1 and 2 for set-top boxes and received the same amount back from the two vendors as advertising revenue. Charter then fraudulently included the approximately $17,000,000 as revenue and operating cash flow for the year 2000. This transaction allowed Charter to inflate year 2000 revenue and operating cash flow by approximately $17,000,000.

28.    It was also part of the scheme that after the fourth quarter of 2000 had ended, Charter reported fraudulently inflated revenue and operating cash flow numbers to the investing public which included investors in Charter securities. These fraudulently inflated numbers were reported by Charter in a press release and in documents sent to the SEC for publication on the Internet. The Charter documents sent to the SEC and published on the Internet were signed by Kalkwarf.

## COUNT I

29.    Paragraphs 1 through 28 of this indictment are realleged and incorporated herein by reference.

30.    On or about August 28, 2000, within the Eastern District of Missouri and elsewhere,

**DAVID G. BARFORD and
KENT D. KALKWARF,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did cause to be transmitted in interstate commerce by wire from Charter's headquarters in Town and Country, Missouri, to the offices of Supplier # 2 in Georgia, certain writings, signs, signals, pictures or sounds; namely, an e-mail requesting that Supplier # 2 send a letter back to Charter setting forth a reason for a price increase.

In violation of Title 18, United States Code, Sections 2, 1343 and 1346.

## COUNT II

31.    Paragraphs 1 through 28 of this indictment are realleged and incorporated herein by reference.

32.    On or about August 29, 2000, within the Eastern District of Missouri and elsewhere,

**DAVID G. BARFORD and
KENT D. KALKWARF,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did cause to be transmitted in interstate commerce by wire from Charter's headquarters in Town and Country, Missouri, to an employee of Supplier # 1 in Georgia, certain writings, signs, signals,

pictures or sounds; namely, an e-mail requesting that Supplier #1 send a letter back to Charter setting forth a reason for a price increase.

In violation of Title 18, United States Code, Sections 2, 1343 and 1346.

## COUNT III

33.    Paragraphs 1 through 28 of this indictment are realleged and incorporated herein by reference.

34.    On or about November 15, 2000, within the Eastern District of Missouri and elsewhere,

**DAVID G. BARFORD and
KENT D. KALKWARF,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did cause to be sent, delivered and moved by the United States Postal Service, a sales invoice addressed from Supplier #1 in Pennsylvania, to "CHARTER COMMUNICATIONS, 1015 C WASHINGTON SQUARE, WASHINGTON MO 63090," and delivered according to the directions thereon, an envelope containing an invoice numbered 6173942 for the $20 overpayment of 200 set-top boxes totaling $4,000.

In violation of Title 18, United States Code, Sections 2, 1341 and 1346.

## COUNT IV

35.    Paragraphs 1 through 28 of this indictment are realleged and incorporated herein by reference.

36.    On or about November 15, 2000, within the Eastern District of Missouri and elsewhere,

-10-

**DAVID G. BARFORD and**
**KENT D. KALKWARF,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did

cause to be sent, delivered and moved by the United States Postal Service, a sales invoice

addressed from Supplier #1 in Pennsylvania, to "CHARTER COMMUNICATIONS, 1620 N

KINGS HWY, CAPE GIRARDEAU MO 63701," and delivered according to the directions

thereon, an envelope containing an invoice numbered 6173940 for the $20 overpayment of 340

set-top boxes totaling $6,800.

In violation of Title 18, United States Code, Sections 2, 1341 and 1346.

### COUNT V

37.    Paragraphs 1 through 28 of this indictment are realleged and incorporated herein

by reference.

38.    On or about November 15, 2000, within the Eastern District of Missouri and

elsewhere,

**DAVID G. BARFORD and**
**KENT D. KALKWARF,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did

cause to be sent, delivered and moved by the United States Postal Service, a sales invoice

addressed from Supplier #1 in Pennsylvania, to "CHARTER COMMUNICATIONS, 312 E

CENTER, SIKESTON MO 63801," and delivered according to the directions thereon, an

envelope containing an invoice numbered 6173939 for the $20 overpayment of 232 set-top boxes

totaling $4,640.

In violation of Title 18, United States Code, Sections 2, 1341 and 1346.

## COUNT VI

39.    Paragraphs 1 through 28 of this indictment are realleged and incorporated herein by reference.

40.    On or about November 20, 2000, within the Eastern District of Missouri and elsewhere,

### DAVID G. BARFORD and
### KENT D. KALKWARF,

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did cause to be sent, delivered and moved by the United States Postal Service, a sales invoice addressed from Supplier #1 in Pennsylvania, to "CHARTER COMMUNICATIONS, 2275 CASSENS DR, STE 138, FENTON MO 63026," and delivered according to the directions thereon, an envelope containing an invoice numbered 6175229 for the $20 overpayment of 3240 set-top boxes totaling $64,800.

In violation of Title 18, United States Code, Sections 2, 1341 and 1346.

## THE 2001 SUBSCRIBER INFLATION SCHEME

### Background

41.    Charter, like other companies in the cable television industry, experienced significant turnover of subscribers. There were two primary reasons why Charter had significant turnover of subscribers. First, subscribers were disconnected because they no longer wanted Charter's service and requested that Charter disconnect their service; these subscribers were

-12-

known as "voluntary disconnects." Second, subscribers were disconnected by Charter because they failed to pay their bills; these subscribers were known as "non-pay disconnects."

42.    Despite a high turnover rate for subscribers, Charter historically had been able to maintain growth in its subscriber numbers by signing up more new subscribers than it lost. Charter held itself out as the industry leader in subscriber growth.

43.    In 2001, due to a weakening economy and greater competition from the satellite dish industry, Charter was experiencing significant difficulty in obtaining enough new subscribers to maintain subscriber growth. In early 2001, Charter was aggressively marketing in order to attempt to reach subscriber growth projections previously issued by Charter and stock analysts covering Charter. By the second quarter of 2001, not even its most aggressive marketing could generate enough new subscribers to enable Charter to obtain its projected growth numbers for subscribers.

**The Scheme**

44.    Beginning in or about May 2001 and continuing through in or about March 2002, Barford, Kalkwarf, McCall and Smith knowingly devised and intended to devise a scheme to defraud investors in Charter securities and the investing public of money and property by means of materially false and fraudulent pretenses, representations and promises, by falsely inflating Charter's subscriber numbers and subscriber growth numbers and by making false statements relating to Charter's subscriber numbers and subscriber growth numbers, in order to inflate artificially Charter's stock price, and to deprive Charter and its stockholders of their material and intangible rights to the defendants' and other employees' honest services. The honest services of which the defendants schemed to deprive Charter and its stockholders included:

-13-

    (a)    the duty to conduct the business of the corporation in an honest fashion;

    (b)    the duty to report corporate financial and operational results accurately and fairly; and

    (c)    the duty to utilize the financial and human resources of the corporation for the best interests of the stockholders.

45.    It was a part of the scheme that the defendants caused Charter to use the following fraudulent methods to inflate Charter's reported subscriber numbers:

    (a)    Charter disregarded its normal disconnect policies and held or delayed the disconnection of non-pay disconnects until after the quarter ended;

    (b)    Charter disregarded its normal disconnect policies and disconnection requests from subscribers and held or delayed the disconnection of voluntary disconnects until after the quarter ended; and

    (c)    Charter physically disconnected subscribers' services before the quarter ended but did not remove the subscribers from Charter's billing system until after the quarter ended. As a result, Charter continued to bill these accounts and include them in reported subscriber numbers, even though the subscribers were disconnected and no longer receiving Charter's services.

These fraudulent practices were referred to by defendants as "managing disconnects" or "holding disconnects."

**Second Quarter - 2001**

46.    It was also part of the scheme that in or about May or June 2001, it became clear to the defendants that Charter would not reach its second quarter subscriber growth projections if its normal business practices for disconnecting customers were followed. In order to meet the

-14-

projected subscriber growth numbers, the defendants agreed to and did, in fact, instruct

employees during weekly conference calls and in other communications to disregard Charter's

normal customer disconnect policies and engage in the fraudulent practice of managing non-pay

disconnects. The purpose of this fraud was to allow Charter to meet its projected subscriber

growth numbers for the second quarter by including subscribers who would have otherwise been

disconnected in the normal course of Charter's business.

47.    It was also part of the scheme that Charter reported these fraudulently inflated

second quarter subscriber numbers to investors in Charter securities and the investing public in a

press release and in two documents filed with the SEC and published on the Internet. The

Charter documents sent to the SEC and published on the Internet were signed by Kalkwarf.

**Third Quarter - 2001**

48.    It was also part of the scheme that during August or September 2001, Barford,

Kalkwarf, McCall and Smith realized that Charter was again experiencing difficulty achieving

any subscriber growth. Therefore, the defendants again instructed employees within each

division during weekly conference calls and in other communications, to disregard Charter's

normal disconnect policies and to manage non-pay disconnects until after the end of the third

quarter in order to inflate fraudulently Charter's subscriber numbers again.

49.    It was also part of the scheme that during the third quarter of 2001, Charter's

subscriber numbers were decreasing so significantly that the defendants concluded Charter would

not obtain its desired subscriber growth by merely managing non-pay disconnects. Therefore,

employees were instructed not only to manage non-pay disconnects but also to manage voluntary

disconnects until after the end of the quarter in order to inflate fraudulently Charter's subscriber

numbers. Some of these voluntary disconnect customers continued to receive bills from Charter because they were not disconnected as requested.

50.    It was also part of the scheme that although numerous employees, including McCall and Smith, expressed objections to the practice of managing disconnects in order to meet projected subscriber numbers, Barford continued to insist that employees manage the disconnects in order to make the numbers. Smith and McCall continued to relay these instructions to subordinates knowing that these instructions would result in Charter reporting inflated subscriber numbers to the investing public.

51.    It was also a part of the scheme that at a meeting on September 14, 2001, attended by numerous Charter executives, Barford and Kalkwarf presented information that Charter had between 60,000 and 90,000 managed disconnects. Then on October 9, 2001, the new Chief Executive Officer's first day of employment at Charter, Barford and Kalkwarf falsely represented in a meeting with the new Chief Executive Officer and two members of Charter's Board of Directors that Charter had only 25,000 managed disconnects, when defendants knew that the number of managed disconnects was actually significantly larger.

52.    It was also part of the scheme that before Charter's third quarter results were announced, the defendants discovered that, as a result of their fraudulently managing disconnects, Charter had accumulated more fraudulent subscribers than it needed to reach its desired subscriber growth number. Therefore, Kalkwarf established an internal "reserve for pending disconnects" by placing just enough subscribers into this "reserve" to allow Charter to meet its subscriber goal. Prior to this, Charter never had any such "reserve" for subscriber numbers.

-16-

53.     It was also part of the scheme that Kalkwarf treated the reserve for pending disconnects as an internal reserve. Therefore, the reserve did not appear on Charter's financial statements. Charter announced only a net number of subscribers to the public which concealed the existence of a reserve and concealed the fraudulent practice of managing disconnects.

54.     It was also part of the scheme that after the third quarter of 2001, Charter reported fraudulently inflated subscriber numbers to investors in Charter securities and the investing public in a press release and in documents filed with the SEC and published on the Internet. The Charter documents sent to the SEC and published on the Internet were signed by Kalkwarf.

**Fourth Quarter - 2001**

55.     It was also part of the scheme that during the fourth quarter of 2001, the defendants once again realized that Charter would not meet its subscriber growth projection for the year 2001 without including managed disconnects. The defendants, with Kalkwarf's knowledge and approval, again instructed employees to manage both non-pay and voluntary disconnects during weekly conference calls and in other communications.

56.     It was also part of the scheme that during the fourth quarter of 2001, the defendants caused Charter to use, in addition to managing disconnects, the following additional fraudulent methods of inflating subscriber numbers:

(a)     Charter generated fictitious subscribers by creating entirely bogus accounts which were then assigned a Charter company address for billing purposes; and

(b)     Charter included gratis or free accounts as reported subscribers. Charter assigned a nominal fee to these accounts in order to include them as paying subscribers. However, no bill was ever generated and no revenue was received by Charter on these accounts.

-17-

57.    It was also part of the scheme that after the fourth quarter of 2001 was completed, Barford and Kalkwarf again used an internal "reserve for pending disconnects" for the purpose of fraudulently manipulating the subscriber numbers to meet their desired subscriber growth while concealing both the existence of the reserve and the practice of managing disconnects from the public.

58.    It was also part of the scheme that in early 2002, the defendants caused Charter to report fraudulently inflated subscriber numbers for the year 2001 to investors in Charter securities and the investing public in documents filed with the SEC and published on the Internet. The Charter documents sent to the SEC and published on the Internet were signed by Kalkwarf.

59.    It was also part of the scheme that on February 11, 2002, Charter announced, in a conference call with market analysts, that it expected to remove 120,000 subscribers during the first quarter of 2002. This announcement falsely implied that these subscribers were merely slow paying customers who were going to be dealt with more consistently after Charter tightened its collection policies in 2002, when in fact, these 120,000 customers were non-pay and voluntary disconnects fraudulently managed by the defendants and held over from 2001 in order to allow Charter to meet its and stock analysts' projections for subscriber numbers and subscriber growth.

## COUNT VII

60.    Paragraphs 1 through 13 and paragraphs 41 through 59 of this indictment are realleged and incorporated herein by reference.

61.    On or about August 1, 2001, within the Eastern District of Missouri and elsewhere,

-18-

**DAVID G. BARFORD,**
**KENT D. KALKWARF and**
**JAMES H. SMITH, III,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did

cause to be transmitted in interstate commerce by wire from Charter's headquarters in Town and

Country, Missouri, for eventual dissemination to the public over the Internet on the SEC's

Electronic Data Gathering, Analysis and Retrieval system (known as EDGAR), in Alexandria,

Virginia, certain writings, signs, signals, pictures or sounds; namely, Charter's Current Report

(Form 8K) which included fraudulently inflated subscriber numbers for the second quarter of

2001.

In violation of Title 18, United States Code, Sections 2, 1343 and 1346.

## COUNT VIII

62.    Paragraphs 1 through 13 and paragraphs 41 through 59 of this indictment are

realleged and incorporated herein by reference.

63.    On or about August 14, 2001, within the Eastern District of Missouri and

elsewhere,

**DAVID G. BARFORD,**
**KENT D. KALKWARF and**
**JAMES H. SMITH, III,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did

cause to be transmitted in interstate commerce by wire from Charter's headquarters in Town and

Country, Missouri, for eventual dissemination to the public over the Internet on the SEC's

Electronic Data Gathering, Analysis and Retrieval system (known as EDGAR), in Alexandria,

Virginia, certain writings, signs, signals, pictures or sounds; namely, Charter's Quarterly Report

(Form 10Q) which included fraudulently inflated subscriber numbers for the second quarter of 2001.

In violation of Title 18, United States Code, Sections 2, 1343 and 1346.

### COUNT IX

64.    Paragraphs 1 through 13 and paragraphs 41 through 59 of this indictment are realleged and incorporated herein by reference.

65.    On or about November 1, 2001, within the Eastern District of Missouri and elsewhere,

**DAVID G. BARFORD,**
**KENT D. KALKWARF and**
**JAMES H. SMITH, III,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did cause to be transmitted in interstate commerce by wire from Charter's headquarters in Town and Country, Missouri, for eventual dissemination to the public over the Internet on the SEC's Electronic Data Gathering, Analysis and Retrieval system (known as EDGAR), in Alexandria, Virginia, certain writings, signs, signals, pictures or sounds; namely, Charter's Current Report (Form 8K) which included fraudulently inflated subscriber numbers for the third quarter of 2001.

In violation of Title 18, United States Code, Sections 2, 1343 and 1346.

### COUNT X

66.    Paragraphs 1 through 13 and paragraphs 41 through 59 of this indictment are realleged and incorporated herein by reference.

67.    On or about November 14, 2001, within the Eastern District of Missouri and elsewhere,

**DAVID G. BARFORD,**
**KENT D. KALKWARF and**
**JAMES H. SMITH, III,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did

cause to be transmitted in interstate commerce by wire from Charter's headquarters in Town and

Country, Missouri, for eventual dissemination to the public over the Internet on the SEC's

Electronic Data Gathering, Analysis and Retrieval system (known as EDGAR), in Alexandria,

Virginia, certain writings, signs, signals, pictures or sounds; namely, Charter's Quarterly Report

(Form 10Q) which included fraudulently inflated subscriber numbers for the third quarter of

2001.

In violation of Title 18, United States Code, Sections 2, 1343 and 1346.

### COUNT XI

68.    Paragraphs 1 through 13 and paragraphs 41 through 59 of this indictment are

realleged and incorporated herein by reference.

69.    On or about January 7, 2002, within the Eastern District of Missouri and

elsewhere,

**DAVID G. BARFORD,**
**KENT D. KALKWARF and**
**JAMES H. SMITH, III,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did

cause to be transmitted in interstate commerce by wire from Charter's headquarters in Town and

Country, Missouri, for eventual dissemination to the public over the Internet on the SEC's

Electronic Data Gathering, Analysis and Retrieval system (known as EDGAR), in Alexandria,

Virginia, certain writings, signs, signals, pictures or sounds; namely, Charter's Current Report

(Form 8K) which included the materially false statement that Charter expected subscriber growth of approximately one percent for 2001.

In violation of Title 18, United States Code, Sections 2, 1343 and 1346.

### COUNT XII

70.    Paragraphs 1 through 13 and paragraphs 41 through 59 of this indictment are realleged and incorporated herein by reference.

71.    On or about February 13, 2002, within the Eastern District of Missouri and elsewhere,

**DAVID G. BARFORD,**
**KENT D. KALKWARF and**
**JAMES H. SMITH, III,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did cause to be transmitted in interstate commerce by wire from Charter's headquarters in Town and Country, Missouri, for eventual dissemination to the public over the Internet on the SEC's Electronic Data Gathering, Analysis and Retrieval system (known as EDGAR), in Alexandria, Virginia, certain writings, signs, signals, pictures or sounds; namely, Charter's Current Report (Form 8K) which included fraudulently inflated year 2001 subscriber numbers.

In violation of Title 18, United States Code, Sections 2, 1343 and 1346.

### COUNT XIII

72.    Paragraphs 1 through 13 and paragraphs 41 through 59 of this indictment are realleged and incorporated herein by reference.

73.    On or about March 29, 2002, within the Eastern District of Missouri and elsewhere,

**DAVID G. BARFORD,**
**KENT D. KALKWARF and**
**JAMES H. SMITH, III,**

defendants, for the purpose of executing this scheme to defraud and in attempting to do so, did

cause to be transmitted in interstate commerce by wire from Charter's headquarters in Town and

Country, Missouri, for eventual dissemination to the public over the Internet on the SEC's

Electronic Data Gathering, Analysis and Retrieval system (known as EDGAR), in Alexandria,

Virginia, certain writings, signs, signals, pictures or sounds; namely, Charter's Annual Report

(Form 10K) which included fraudulently inflated subscriber numbers for the year 2001.

In violation of Title 18, United States Code, Sections 2, 1343 and 1346.

### COUNT XIV

74.    Paragraphs 1 through 13 and paragraphs 41 through 59 of this indictment are

realleged and incorporated herein by reference.

75.    Beginning in about May 2000 and continuing through in or about March 2002, in

the Eastern District of Missouri and elsewhere,

**DAVID G. BARFORD,**
**KENT D. KALKWARF,**
**DAVID L. McCALL and**
**JAMES H. SMITH, III,**

defendants, did knowingly and willfully conspire, combine, confederate and agree with one

another and with other persons known and unknown to the Grand Jury to commit offenses

against the United States; namely, wire fraud in violation of Title 18, United States Code,

Sections 1343 and 1346, by agreeing to engage in a scheme to defraud investors in Charter

securities and the investing public by means of materially false and fraudulent pretenses,

representations and promises, by falsely inflating Charter's subscriber growth numbers and filing false statements with the SEC reflecting Charter's fraudulently inflated subscriber numbers and subscriber growth numbers.

### Overt Acts

76.    In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Eastern District of Missouri and elsewhere:

A.    On or about August 1, 2001, in the Eastern District of Missouri, Kalkwarf signed Charter's Current Report (Form 8K) containing second quarter subscriber numbers that had been fraudulently inflated by the defendants.

B.    On or about August 14, 2001, in the Eastern District of Missouri, Kalkwarf signed Charter's Quarterly Report (Form 10Q) containing second quarter subscriber numbers that had been fraudulently inflated by the defendants.

C.    On or about October 5, 2001, in the Eastern District of Missouri, Barford sent an e-mail to employees at each of Charter's two divisions which stated, "Please provide: Basic net gain in 4Q to get to 1% and 1.4% growth rate for the year. [Then][1] tell me how many managed disconnects you would still have left over after getting to these numbers."

D.    On or about November 1, 2001, in the Eastern District of Missouri, Kalkwarf signed Charter's Current Report (Form 8K) containing third quarter subscriber numbers that had been fraudulently inflated by the defendants.

---

[1]Brackets indicate a misspelling in the original document and replacement with the word properly spelled.

E.    On or about November 9, 2001, in the Eastern District of Missouri, Barford sent an e-mail to a Charter senior executive which stated, "Bottom line is that we will manage to the number of 1% growth but will carry over significant amount of disconnects that we are trying to quantify now."

F.    On or about November 14, 2001, in the Eastern District of Missouri, Kalkwarf signed Charter's Quarterly Report (Form 10Q) containing third quarter subscriber numbers that had been fraudulently inflated by the defendants.

G.    On or about December 6, 2001, in the Eastern District of Missouri, Barford sent an e-mail to Kalkwarf and a senior Charter executive which stated, "Basic growth for December should be over 60k holding discos."

H.    On or about December 7, 2001, in the Eastern District of Missouri, Barford sent an e-mail to Kalkwarf which stated, "We are trying to figure out how many we could disconnect in December and still be in line with others. Is .5% or .6% sellable without revising downward [guidance]? Give me a call on my cell . . . when you get a break."

I.    In or about December 2001, in the Eastern District of Missouri, Kalkwarf wrote a memo to Barford and a Charter senior executive which discussed the following three options for reporting 2001 results:

1.    One idea is to report the 6,950,000 customers as our actual customers (giving us a growth rate of approximately 1%) but disclose in the call that we have customers included in this number that were the last customers that we brought on for the discounted policy . . . .

2.    We can continue on the same path until late next year and bleed the disconnects in over time.

3.    Take the hit in the first quarter on the call for the change in strategy. [Similar] discussion as point number 1.

-25-

This same memo concluded:

> These are my thoughts as I typed this I kind of like number 1. We
> should still take a hit (140,000 customers times $3600 per customer
> is just under $1 per share) but at least we are running the business and
> we can argue that we did end the year at approximately 1%.

J. On or about December 10, 2001, in the Eastern District of Missouri, Kalkwarf

sent an e-mail to Barford and a senior Charter executive which stated:

> My thoughts on carryover of basic customers is that we should stick
> with original plan to get 61,000 net gain for December. This will
> help us get revenue and cash flow for the year and then we can
> reserve the customers to get to .5%.

K. On or about December 10, 2001, in the Eastern District of Missouri, Kalkwarf

sent an e-mail to Barford and a senior Charter executive which stated:

> My thoughts are to discuss the issue in the first quarter of next year
> as we are going to take a hit for it no matter what and if we have 0 or
> negative growth this year after our statements of last week and earlier
> we will take two hits - one for customer growth and one for continued
> lack of [credibility].

L. On or about December 10, 2001, in the Eastern District of Missouri, Kalkwarf

received an email which asked, "What do we expect the carryover managed disconnect number

to be?" Kalkwarf responded in an e-mail which stated, "At .5% growth the number is 100,000 -

at no growth the number is approximately 60,000 - to completely clean-up the number would be

-1% growth."

M. On or about December 21, 2001, in the Eastern District of Missouri, just prior to

the cutoff for Charter's 2001 financial reporting year, Barford sent an e-mail to Kalkwarf and a

senior Charter executive which stated, "I want to give the field direction to dump all of the

voluntary and 120 day or greater nonpays right after cutoff to cut down on prorates, bad debt and customer calls."

N.    On or about January 7, 2002, in the Eastern District of Missouri, Kalkwarf signed Charter's Current Report (Form 8K) containing the materially false statement that Charter expected subscriber growth of approximately one percent for the year 2001.

O.    On or about February 13, 2002, in the Eastern District of Missouri, Kalkwarf signed Charter's Current Report (Form 8K) containing 2001 year end subscriber numbers that had been fraudulently inflated by the defendants.

P.    On or about March 29, 2002, in the Eastern District of Missouri, Kalkwarf signed Charter's Annual Report (Form 10K) containing 2001 year end subscriber numbers that had been fraudulently inflated by the defendants.

All in violation of Title 18, United States Code, Section 371.

A TRUE BILL.

_____

FOREPERSON

RAYMOND W. GRUENDER
United States Attorney

_____

JEFFREY B. JENSEN (#86166)
Assistant United States Attorney