UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MILDRED W. FINCH, *et al.*, | ) | CASE NO. 1:02 CV 132 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | JUDGE SANDRA S. BECKWITH |
| | ) | |
| GEORGE FIORINI, DBA FIORINI | ) | |
| AGENCY, *et al.*, | ) | RESPONSE OF INTERVENOR |
| | ) | SANITEC INDUSTRIES, INC. |
| Defendants. | ) | TO SHOW CAUSE ORDER |

Intervenor, Sanitec Industries, Inc. ("SII"), hereby responds to this Court's show cause order to oppose the motion of plaintiffs, Mildred W. Finch, *et al.* (collectively "Finch"), for leave to file a third amended complaint (Docket No. 105).

## BACKGROUND

### A. Procedural History

Finch filed this action on February 25, 2002. (Docket No. 1). The complaint asserted two claims: (1) securities fraud under section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 105-5 (17 C.F.R. § 240.105-5); and (2) civil liability under the Racketeer Influenced and Corrupt Organization Act ("RICO") (18 U.S.C. § 1962). Finch subsequently filed or sought to file a series of amended complaints.[1] The operative pleading is the Second Amended Complaint, filed March 20, 2003 (Docket No. 55).[2]

---

[1] *See* Docket Nos. 3 (First Amd. Compl., Apr. 5, 2002); 10 (Second Amd. Compl., June 3, 2002); 14, 25 (Motion for Leave to File Third Amd. Compl., June 11 & 24, 2002); 47 (Motion for Leave to File Second Amd. Compl., Dec. 26, 2002); 49 (Motion for Leave to File Second Amd. Compl., Feb. 10, 2003); 52 (Second Motion for Leave to File Second Amd. Compl., Mar. 3, 2003). The last motion was granted by the Court on March 20, 2003 (Docket No. 54).

[2] On December 12, 2003, Limited filed its answer and a motion to dismiss that complaint. (Docket Nos. 87-89).

{547546:}

Finch alleges that defendants George Fiorini ("Fiorini"),[3] Stephen Ventre ("Ventre") and Terrance Lee Quatkemeyer a/k/a Terry Quinn ("Quatkemeyer"), and Sanitec Group, Inc. ("Group") engaged in a scheme to defraud investors in promissory notes of IGW Trust, Standard Trust and Guardian Investments LLC ("Guardian"). Finch alleges that investors' funds were made available to Quatkemeyer to supply a lavish lifestyle and to make personal investments, including the acquisition of Limited. (Second Amd. Compl. ¶ 16). The Second Amended Complaint alleges (¶ 19) that mail and wire fraud are the predicate acts for a RICO claim. The factual events underlying the complaint are alleged to have occurred in 1998, 1999 and 2000. (Docket No. 55 ¶ 98; *see also* Docket No. 105, Att. 1 ¶ 13).

While Sanitec, Ltd. ("Limited") is named as a defendant in the Second Amended Complaint, there is no factual allegation that it engaged in fraudulent or wrongful conduct. Limited denied the allegations and moved to dismiss. (Docket Nos. 87-89). On April 5, 2004, because of a dispute as to ownership and control, the case was stayed as to Limited. (Docket No. 104).

Finch first moved to certify this case as a class action on June 28, 2002. (Docket No. 27). On November 7, 2002, the Court granted Finch's motion. However, on August 19, 2003, the Court decertified the previously certified class and denied Finch's motion for an order redefining the class. (Docket No. 71). On August 25, 2003, Finch filed a motion to certify a revised class, which Limited opposed. (Docket Nos. 72-73, 75). At a November 18, 2003 conference, the Court denied the motion on the ground that Finch failed to demonstrate that the "adequacy of representation requirement is satisfied." (Docket No. 82). The Court went on to find that:

---

[3] Fiorini filed for Chapter 7 bankruptcy protection on November 30, 2003. (S.D. Ohio Case No. 03-BK-19177). On August 16, 2004, Fiorini pled guilty to criminal charges. *United States v. Fiorini* (S.D. Ohio Case No. 03-CR-68, Docket Nos. 87, 89).

{547546:}

> The Court further observes that Plaintiffs and their counsel have not demonstrated that they will fairly represent the interests of other members of the putative class who have filed their own lawsuits in this and other courts. Plaintiffs, through their counsel, have declined to participate in various of the joint efforts of other members of the potential class to resolve their claims arising from some of the conduct that also gives rise to Plaintiffs' claims. For those reasons, the Court continues to be unpersuaded with respect to the requirement of Rule 23(a)(4).

(*Id.*). Not taking no for an answer, on December 8, 2003, Finch filed a renewed motion to certify class, which the Court denied. (Docket Nos. 86, 96).

On December 3, 2003, the Court issued a Scheduling Order. (Docket No. 84). The fact discovery deadline was April 2, 2004. Finch did not identify expert witnesses and disclose reports by the May 3, 2004 due date. Nor did Finch timely file any dispositive motions by July 19, 2004. The final pretrial conference is set for November 19, 2004, with trial set for December 6, 2004.

B.    SII "Settlement Agreement"

Finch's proposed third amended complaint seeks to add SII as a new defendant to this two year old case. (Docket No. 105, Att. 1). SII is a California corporation incorporated on February 19, 2003 with offices in Sun Valley, California and Washington, DC. (Ex. 1, Declaration of Richard J. Oparil ("Oparil Decl.") ¶ 2). SII has no ownership interest in defendants Group, Limited, or Guardian; Ventre, Quatkemeyer, and Fiorini have no ownership interest in or connection to SII. (*Id.* ¶ 3).

The premise of the proposed amendment is that an agreement with Group and others fraudulently transferred certain intellectual property to SII. (Mot. at 1-2; Proposed Third Amd. Compl. ¶¶ 30-32). Finch attaches an assignment as Ex. A to the proposed pleading. While SII did enter into an agreement with, *inter alia*, Group, Guardian, Ventre, and certain Guardian investors in early 2004 (Ex. 2), Finch's proposed pleading omits undisputable and highly

{547546:}

- 3 -

relevant facts. The assignment does not constitute the complete agreement between the parties. (Oparil Decl. ¶ 4).

SII did not attempt to hide the Settlement Agreement from this Court, Finch or anyone else. Indeed, it voluntarily and publicly filed a copy with the Court in this action on February 25, 2004, making it available electronically through Pacer (Docket No. 102).[4]

The Agreement required the represented investors or their counsel to create a Trust, to be initially managed by Robert C. Kranz of Cincinnati, as an independent Administrator who is acceptable and accountable to counsel for the represented investors (§ 5). SII agreed to make the following payments to the Trust:

- For a specified time period, an annual payment of $50,000 (being paid on a monthly basis), and an additional $6,000 monthly escrow payment to guarantee payment of that amount (§ 6(a); *see also* Ex. 3);

- Payment of $50,000.00 on the sale or lease of any new patented Sanitec medical waste treatment unit (§ 6(b)). These payments would end when the amount paid to the Trust equals $4 million, or December 31, 2008, or upon expiration of patent rights whichever occurs first (§ 7); and

- A payment of $5,000 to use for the Trust's administrative purposes (§ 8).

As part of the Trust, the Administrator would set up three funds: (1) 5% of the funds shall be placed into an administrative fund to pay the costs associated with managing the Trust; (2) 63% would be placed into an investor fund; and 32% would be placed into a fund for attorneys' fees. (§ 11). The settling investors would be paid "such sums as are available for distribution by the Administrator pro-rata, based upon the total amount of any unreturned investment, exclusive of interest, as of January 1, 2003. Such distributions shall be made by the Administrator from time to time as the Administrator deems appropriate." (§ 12). At the time of

---

[4] Some details of the Settlement Agreement were modified by a recent Escrow Agreement. (Ex. 3).

{547546:}

any distribution to settling investors, the Administrator would also distribute to the investors' counsel legal fee from the fee fund in the percentages set forth in Ex. D to the Agreement. (§ 13).

Significantly, the Settlement Agreement was not designed to benefit a select group of investors. It specifically provided that any investor that was not a party to the Agreement (including the Finch plaintiffs in this action) would be given the opportunity to join and share in the funds on a pro rata basis: "Upon final execution of the Settlement Agreement, the Administrator shall notify all Unrepresented Investors of the terms of the settlement and shall allow each of them to submit a proof of claim and execute a release of claims similar to those executed by the Represented Investors." (§ 12; *see also* § 15). The notification was recently sent to the investors. (Oparil Decl. ¶ 6; Ex. 4). On September 7, 2004, SII's counsel sent Finch's counsel a copy of the settlement notification and specifically invited his clients to join. (*Id.*).

In order to ensure transparency, the Agreement established disclosure obligations -- SII must supply to the Administrator copies of its annual federal tax returns (§ 6), and the Administrator must submit an annual report to the investors' counsel (§ 14).

As part of the Agreement, SII would obtain an assignment of intellectual property. Section 2 states that:

> Group, Guardian, and Ventre hereby assign all rights, title and interest they claim or could forever from this date forward claim in the assets (as reflected in the December 31, 2002 balance sheet of Group) of Group to Industries and intellectual property of Group to Industries. Upon execution of the Settlement Agreement, Group shall execute and deliver to Industries an assignment of patents and/or trademarks in a form suitable for filing in the U.S. Patent and Trademark Office, and (b) a consent to foreclosure. The assignments and consent are attached hereto as Exhibit "B". Upon execution of this Settlement Agreement, all engineering drawings

        pertaining to any Sanitec equipment, machinery, technology and devices and process ("Documents") shall be forwarded to Industries.

The settling investors assigned to SII all right, title and interest they claimed in the assets of A.B.B. Sanitec West, Inc. ("Sanitec West"), SII, Limited, and Group. The parties to the Settlement Agreement obtained full mutual releases. (§ 16).

After the Agreement was fully executed, Group, Guardian, and Ventre executed the intellectual property assignments required by section 2, which were duly recorded in the Patent and Trademark Office. (Exs. 5-6). In turn, SII has made the required payments to the Trust, in the amount to date of $39,125.[5] (Oparil Decl. ¶ 5).

Thus, contrary to the bare allegations in the proposed third amended complaint, the terms and conditions of the Settlement Agreement have been transparent and non-fraudulent.

### C. New Jersey Foreclosure Judgment

Finch's motion and proposed pleading is fatally defective because SII's ownership of intellectual property is not based solely on the Settlement Agreement. SII has a valid final judgment of foreclosure on such assets from the Superior Court of New Jersey, which is not even mentioned in the proposed complaint. Therefore, as a matter of law, SII is the owner of the intellectual property at issue even without the Settlement Agreement.

On March 1, 2002, Platinum Funding Corporation ("Platinum") and Group entered into a Factoring Agreement pursuant to which Group agreed to tender to Platinum invoices rendered to Group's customers for, among other things, goods sold and delivered to or services performed for its customers. (Ex. 7). Platinum's fee was calculated based on the delivery by Group of a

---

[5] The payments consist of $5,000 for initial administrative expenses, $28,125 for the guaranteed annual payment amount, and $6,000 for an escrow fund. SII will continue to make monthly payments as well as further payments upon sale of its patented medical waste disposal units up to certain limits set forth in the Settlement Agreement. (Oparil Decl. ¶ 5).

{547546:}

minimum of $125,000 of accounts receivable each month. If Group placed less than $125,000 of accounts receivable with Platinum each month, then under section 9 of the Factoring Agreement, Group owed Platinum an increased fee. Further, if Group placed no accounts receivable with Platinum for a month, then the increased fee was calculated in a different manner. If Group placed no accounts receivable with Platinum for 45 days, then under section 9 of the Factoring Agreement, Platinum could terminate the agreement on three days written notice.

To secure Group's performance of its objections to Platinum, Group executed a Security Agreement dated March 1, 2002 (the "Security Agreement"). (Ex. 8). Section 1 created a security interest in favor of Platinum in Group's "Accounts, Chattel Paper, Inventory, Equipment, Instruments, Investment Property, General Intangibles, Documents and proceeds and products of the foregoing ('the Collateral')."[6] Section 2 of the Security Agreement secured all liabilities and obligations of Group owed to Platinum. A "default" occurred under the Security Agreement where a "breach or default shall be made in the due performance or observance of any provision of this Agreement and such breach or default shall continue for a period of 5 days after written notice thereof shall have been received by [Group] from Platinum . . . Platinum shall have all of the rights and remedies of a secured party under the Uniform Commercial Code and shall have full power and authority to sell or otherwise dispose of the Collateral or any part thereof." (Security Agreement § 10). New Jersey law applies to the agreement (§ 21).

After entering into the transaction, Platinum perfected its security interest created by the Security Agreement by filing a UCC Financing Statement on March 20, 2002 with the Secretary of State of Delaware, where Group was incorporated. (Ex. 9).

---

[6] As discussed below, "general intangibles" is defined to include patent rights.

Platinum performed its obligations under the Factoring Agreement. However, in breach of its obligations under the Factoring Agreement and the Security Agreement, Group (1) ceased placing any accounts receivable with Platinum; (2) failed to pay any of the fees set in the Factoring Agreement; and (3) allowed its inventory and equipment to be removed and dissipated and/or sold. In a May 1, 2003 letter, Platinum terminated the Factoring Agreement. (Ex. 10).

On November 24, 2003, Platinum assigned to SII all right, title and interest to the contracts between Platinum and Group. (Ex. 11). On December 5, 2003, SII gave another written notice to Group of its "breach or default" on its contractual obligations. (Exs. 10, 13). On December 12, 2003, SII sent a UCC financing statement amendment form to the Secretary of State of Delaware for filing to record the assignment pursuant to the Assignment Agreement. (Ex. 12). Group breached or defaulted under the terms of the Factoring Agreement and/or the Security Agreement and its default had not been cured. On December 17, 2003, SII filed a Complaint in Foreclosure in Superior Court of New Jersey, Chancery Division, Bergen County, captioned *Sanitec Indus., Inc. v. Sanitec Group LLC, et al.* (Docket No. F-22524-03). (Ex. 14). The Complaint sought foreclosure of all of Group's collateral, including its intellectual property.

On March 5, 2004, the New Jersey Court entered a final judgment in foreclosure in SII's favor. That judgment provided that:

> ORDERED, ADJUDGED and DECREED that all of Defendant Group's right, title and interest in U.S. Patent No. 5,270,000 be and the same is hereby transferred and assigned to plaintiff; and it is hereby

> FURTHER ORDERED, ADJUDGED and DECREED that all of Defendant Group's right, title and interest in the License Agreement with Micro-Waste Corporation ("License Agreement") and the U.S. Trademark Serial Numbers 75/848,407 and U.S. Trademark Registration No. 1,991,211 and U.S. Trademark Registration No. 2,238,405 (collectively "Trademarks") be and the same are hereby transferred and assigned to plaintiff; and it is hereby