UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **MILDRED W. FINCH,** *et al.*, | ) | CASE NO. 1:02 CV 132 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | JUDGE SANDRA S. BECKWITH |
| | ) | |
| **GEORGE FIORINI, DBA FIORINI** | ) | FURTHER |
| **AGENCY,** *et al.*, | ) | RESPONSE OF INTERVENOR |
| | ) | SANITEC INDUSTRIES, INC. |
| Defendants. | ) | TO SHOW CAUSE ORDER |

Intervenor, Sanitec Industries, Inc. ("SII"), hereby responds to this Court's October 25, 2004 Order (Docket No. 113) to provide a further response to the motion of plaintiffs, Mildred W. Finch, *et al.* (collectively "Finch"), for leave to file a third amended complaint (Docket No. 105).

## ARGUMENT

**I. FINCH CANNOT PREVAIL ON A FRAUDULENT TRANSFER CLAIM AGAINST SII AND THE REQUESTED AMENDMENT WOULD BE FUTILE.**

**A. Limited's Assets Were Not Transferred Under The Settlement Agreement.**

Finch's sole claim against SII is for "fraudulent conveyances of the Sanitec patents." (Docket No. 111 at 3). The fraudulent transfer count in Finch's proposed pleading is based on the Settlement Agreement among Group and its affiliates, SII, and 24 investor-plaintiffs in other cases. (Docket No. 105 Ex. A ¶¶ 31-32). Finch alleges that the agreement somehow affected "the only valuable asset of the Defendant Sanitec Ltd., thus rendering Plaintiffs' claim for the imposition of a constructive trust on Sanitec Ltd. valueless." (*Id.* ¶ 32).

Nowhere does Finch explain how an agreement between SII and Group affected Finch's claim against defendant Sanitec, Ltd. ("Limited"). Limited was **not** a party to the Settlement

Agreement, and its then-existing assets were simply not part of that agreement.[1] Ohio's fraudulent transfer statute is triggered only when "[a] transfer made or an obligation incurred **by a debtor** is fraudulent as to a creditor[.]" R.C. § 1336.04(A) (emphasis added). The **"debtor"** "means a person who is liable on a claim." R.C. § 1336.01(F) (emphasis added). The debtor in Finch's proposed complaint, Limited, was not a party to the transfer. Thus, the Settlement Agreement cannot be deemed a fraudulent transfer under the statute.

> B. **SII's Security Interest And Foreclosure Precludes A Claim Under The Fraudulent Transfer Act.**
>
> 1. **The Assets That Were The Subject Of A Perfected Security Interest, Are Not Considered Assets Of The Debtor Under Ohio's Fraudulent Transfer Act.**

Finch's argument that they were not parties to the foreclosure action (Docket No. 111 at 7) misses the point. Because the intellectual property assets at issue were the subject of perfected security interests in favor of SII (Docket No. 109 at 6-9), a fact that Finch's reply did not contest, there can be no fraudulent conveyance as a matter of law.

Ohio law "creates a right of action for a creditor to set aside an allegedly fraudulent transfer of assets." *See, e.g.*, *Sanderson Farms, Inc. v. Gasbarro*, 2004 Ohio 1460, 2004 Ohio App. Lexis 1296 at *28 (Ohio Ct. App., Mar. 25, 2004) (Ex. 7), citing R.C. § 1336.01, *et seq.* To be a fraudulent transfer, there must be a "transfer" by the debtor, which means "disposing of or parting with an **asset** or an interest in an **asset**[.]" R.C. § 1336.01(L) (emphasis added). Under the statute, an "asset" is "property of a debtor, but **does not include** . . . Property to the extent it is encumbered by a **valid lien**[.]" R.C. § 1336.01(B)(1) (emphasis added). A "lien" is an interest in property to secure a debt or obligation, including "a security interest created by

---

[1] The proposed third amended complaint does not allege that Limited's transfer of assets to Group in 2002 was fraudulent.

agreement, a judicial lien obtained by legal or equitable process or proceedings, a common law lien, or a statutory lien." R.C. § 1336.01(H). A valid lien has been held to mean that:

> In order to be a "valid lien," the lien must be "effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." See R.C. 1336.04(M). This ordinarily means that a **security interest must be perfected** under R.C. 1309.20.

*Longo Constr., Inc. v. ASAP Technical Servs., Inc.*, 140 Ohio App. 3d 665, 673, 748 N.E.2d 1164 (Ohio Ct. App. 2000), citing *Comer v. Calim*, 128 Ohio App. 3d 599, 604, 716 N.E.2d 245 (Ohio Ct. App. 1998).

In *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc.*, 87 Ohio App. 3d 644, 622 N.E.2d 1113 (Ohio App. 1993), the shareholders, officers, and directors of a mulch business (GSO), established a new company (GSO Equipment) to make mulch. GSO Equipment obtained loans from BancOhio to purchase the machinery and equipment it needed in its new business and for working capital. GSO Equipment granted the lender a security interest in its machines, inventory, and receivables. The plaintiff (Baker) was an unsecured creditor that supplied parts to the company. Before closing the business for lack of profitability, GSO Equipment sold its machinery and inventory to GSO. Baker, the unsecured creditor, then brought suit alleging, among other things, that the transfer of assets from GSO Equipment to GSO was a fraudulent transfer under the Ohio statute. The trial court found that the transfer was not subject to that statute, and the Court of Appeals affirmed. Under section 1336.01(B), assets of a debtor encumbered by a valid lien are not considered property of the debtor and a transfer of such assets is exempt from the fraudulent transfer statute. *Id.* at 651-52. BancOhio secured its loans with perfected security interests on GSO Equipment's physical assets. As a result, the Court held that:

> since the equipment and inventory at issue were encumbered by valid liens, they are not assets; not being assets, they do not fall within the definition of transfers governed by the Fraudulent Transfer Act and, to that extent, are "exempt" from the provisions thereof.

*Id.* at 652.

The intellectual property assets at issue here were encumbered by a perfected security interest. They are therefore not deemed assets of Group, and their transfer pursuant to a final judgment of foreclosure on the security interest cannot be fraudulent under Ohio law.

The disputed intellectual property assets have been the subject of a perfected security interest since 2001 -- a year before the instant suit was filed. On June 5, 2001, Platinum Funding Corporation ("Platinum") and Limited entered into a Factoring Agreement. (Ex. 1). Under that contract, Limited agreed to sell accounts receivable to Platinum and it further agreed to enter into a security agreement to secure its obligations to Platinum. (*Id.* ¶¶ 1, 3). Also on June 5, 2001, the parties entered into the Security Agreement (Ex. 2), which granted Platinum a security in all of Limited's assets listed in Exhibit A to that agreement (*Id.* ¶ 1). The assets included "General Intangibles" defined as:

> All "General Intangibles" (as such term is defined in Section 9-106 of the UCC) now owned or hereafter acquired by Debtor, and including without limitation all right, title and interest that Debtor may now or hereafter have in or under any Contract, all customer lists, trademarks, patents, rights in intellectual property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable) technical information, procedures, designs, knowledge, know-how, software, databases, data, skill, expertise, recipes, experience, processes, models, drawings, materials and records, goodwill (including without limitation the goodwill associated with any trademark, trademark registration or trademark licensed under any trademark license), claims in or under insurance policies (including without limitation any unearned premiums), uncertificated securities, deposit accounts, rights to receive tax refunds and other payments, and rights of indemnification.

(*Id.* Ex. A ¶ 7).[2]  Platinum perfected its security interest on June 7, 2001, when it filed a UCC Financing Statement with the Delaware Secretary of State.  (Ex. 3).[3]

In 2002, Limited's assets were transferred to Group.  However, those assets were still subject to Platinum's security interest.  As discussed in SII's response, in March 2002, Platinum and Group entered into Factoring and Servicing Agreements, under which the parties had mutual obligations.  (Docket No. 109 at 6-7 & Exs. 7-8).  Platinum received from Group a security interest in the intellectual property assets that had been transferred to Group.  (*Id.* at 7, 13 & n.10, Ex. 8 ¶¶ 1-2).  Platinum filed a UCC Financing Statement on March 20, 2002 with the Delaware Secretary of State and thus again perfected its security interest in Group's intellectual property assets.  (*Id.* Ex. 9).

As also set forth in SII's response to the show cause order (at 8), on November 24, 2003, Platinum assigned to SII its rights, title, and interest under the agreements with Limited and Group, including the Security Agreements and perfected security interests.  (*Id.* Ex. 11).  On December 12, 2003, SII filed a UCC financing statement amendment with the Delaware Secretary of State of Delaware, reflecting the assignment from Platinum.  SII's security interest in the assets of Limited and Group was perfected.[4]  (*Id.* Ex. 12).

---

[2]  "'General intangible' means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction.  The term includes payment intangibles and software."  N.J.S.A § 12A:9-102(42).  *See also* R.C. § 1309.102(A)(42).  Under the Security Agreement, New Jersey law applies.  (Ex. 2 ¶ 19).

[3]  Platinum also filed a UCC Financing Statement in Essex County, New Jersey, on August 7, 2001.  (Ex. 4).

[4]  SII was not required to file to maintain the perfected security interest. N.J.S.A. § 12A:9-310(c) ("If a secured party assigns a perfected security interest or agricultural lien, a filing under this chapter is not required to continue the perfected status of the security interest against creditors of and transferees from the original debtor."); R.C. § 1309.310(C)

A security interest is perfected by filing a financing statement. N.J.S.A. §§ 12A:9-308(a), 12A:9-310(a); R.C. §§ 1309.308(A), 1309.310(A); *Lloyds Credit Corp. v. McClain Heller Ins., Inc.*, 620 A.2d 472, 473 (N.J. Super. Ct. 1992) (security interest in general intangibles may be perfected by filing); *In re Richardson*, 216 B.R. 206, 219-20 (Bankr. S.D. Ohio 1997) (accord); *Liqui\*Lawn Corp. v. Andersons*, 509 N.E.2d 1236, 1239 (Ohio 1987) (accord); *Moldo v. Matsco, Inc.*, 252 F.3d 1039, 1059 (9th Cir. 2001) (secured party perfected their security interest in debtor's patent by recording it with the Secretary of State and thus have priority over the Trustee's claim because they recorded their interest before the filing of a bankruptcy petition), *cert. denied*, 534 U.S. 1130 (2002); *Joseph v. 1200 Valencia, Inc.*, 137 B.R. 778, 781 (Bankr. C.D. Cal. 1992) (UCC provides for perfection of a security interest in general intangibles by filing with the state). Here, Platinum and SII perfected their security interests. (Exs. 3-4; Docket No. 109 Exs. 9, 12, 13, 16).

Because the intellectual property assets of Limited and later Group were encumbered by a security interest in favor of Platinum (later assigned to SII), such assets cannot be the subject of a R.C. § 1336.01 fraudulent transfer claim.

In addition, New Jersey law (which governs both Security Agreements for Limited and Group (Ex. 2 ¶ 19; Docket No. 109 Ex. 8 ¶ 21)), provides that "a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and **against creditors**." N.J.S.A. § 12A:9-201(a) (emphasis added). *See also* R.C. § 1309.201(A) ("a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors"). "Creditors" means "a general creditor, a secured creditor, a lien creditor and any representative of creditors, including an assignee for the benefit

---

(accord). Out of an abundance of caution, SII also filed the Platinum assignment with the PTO. (Docket No. 109 Ex. 16).

of creditors, a trustee in bankruptcy, a receiver in equity and an executor or administrator of an insolvent debtor's or assignor's estate." N.J.S.A. § 12A:1-201(12). *See also* R.C. § 1301.01(L); *Liqui\*Lawn Corp.*, 509 N.E.2d at 1239 (party with a perfected security interest has priority over a claim by an unsecured creditor). Thus, as a matter of New Jersey and Ohio law, the Security Agreements assigned to SII are effective against general creditors, including the Finch plaintiffs.

Before the Settlement Agreement was executed in early 2004, Group's intellectual property assets, among others, were the subject of a filed and thus perfected security interest in favor of Platinum. As such, they are not deemed "assets" of Group, and are thus not subject to the fraudulent conveyance statute.

### C.    SII Had A Right To Foreclosure.

At the time SII purchased Platinum's interests, Group had been in default under the Factoring Agreement. (Docket No. 109 Ex. 10). On December 5, 2003, SII gave another written notice to Group of its "breach or default" on its contractual obligations. (*Id.* Ex. 13). Group did not cure the breach or default.

On December 17, 2003, SII filed a Complaint in Foreclosure in Superior Court of New Jersey, Chancery Division, Bergen County, captioned *Sanitec Indus., Inc. v. Sanitec Group LLC, et al.* (Docket No. F-22524-03). (*Id.* Ex. 14). The Complaint sought foreclosure of all of Group's collateral, including its intellectual property. On March 5, 2004, the New Jersey Court entered a final judgment in foreclosure in SII's favor. (*Id.* Ex. 15).

Given its perfected security interest and Group's default, SII had the clear right to foreclose or to take assignment of Group's encumbered assets under the Security Agreement and the UCC. Upon Group's default, Platinum (and now SII) had "all of the rights and remedies of a secured party under the Uniform Commercial Code and shall have full power and authority to sell or otherwise dispose of the Collateral or any part thereof." (*Id.* Ex. 8 ¶ 10).

The UCC provides that:

> After default, a secured party has the rights provided in this part and, except as otherwise provided in 12A:9-602, those provided by agreement of the parties. A secured party:
>
> may reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure[.]

N.J.S.A. § 12A:9-601(a)(1). Ohio's version of the UCC also provides that after default, the secured party "[m]ay reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure[.]" R.C. § 1309.601(A)(1).

Finch's proposed third amended complaint seeks to hold SII liable for doing that which was authorized by both contract and law. SII had the legal right to foreclose on and take ownership of the intellectual property assets. Accepting Finch's theory would mean that every lender that takes action to enforce its rights under the UCC or contract would be exposed to a potential fraudulent transfer action. Finch's theory is contrary to law and their attempt to add it to this action should be denied. Finch's motion should be denied as futile.

## II.     THE SETTLEMENT AGREEMENT IS NOT ILLUSORY.

Finch's argument that the Settlement Agreement is "illusory" is nonsense. (Docket No. 111 at 3-6). On its face, the agreement is supported by consideration. *See, e.g.*, *Morrison v. Circuit City Stores, Inc.*, 70 F. Supp. 2d 815 (S.D. Ohio 1999) ("Under Ohio law, '[v]aluable consideration may consist of either a detriment to the promisee or a benefit to the promisor.' Furthermore, '[i]t is axiomatic that courts, as a general rule, will not inquire into the adequacy of consideration once consideration is said to exist.'"), *aff'd*, 317 F.3d 646 (6th Cir. 2003), quoting *Ford v. Tandy Transp., Inc.*, 620 N.E.2d 996, 1009 (Ohio App. 1993) and *Rogers v. Runfola & Assoc., Inc.*, 565 N.E.2d 540, 542 (Ohio 1991). The parties to the Settlement

Agreement have not tried to keep it secret. To the contrary, it has been publicly filed in this Court. (Docket Nos. 102 and 109 Exs. 2-3).

The Trust created to administer the settlement fund has a lien on the intellectual property rights until SII has made all of the agreed upon payments. (Docket No. 109 Ex. 2. ¶ 6). SII also must submit copies of its annual federal tax returns to the Administrator of the Trust. (*Id.*). To date, SII has made the required payments to the Trust. (Ex. 5, Supplemental Declaration of Richard J. Oparil ("Oparil Decl.") ¶ 5). A party may seek to enforce the terms and conditions of the agreement in either this Court or the Hamilton County Court of Common Pleas. (Docket No. 109 Ex. 2 ¶ 18). The plaintiffs in this action have been repeatedly invited to join the settlement. (Oparil Decl. ¶ 4). Accordingly, the Settlement Agreement is a valid and enforceable contract, which has already created value for the settling investors.[5]

### III. FINCH HAS NOT ASSERTED ANY PROPER BASIS FOR ASSERTING PERSONAL JURISDICTION OVER SII.

Finch's reply (Docket No. 111) sets forth no proper factual or legal basis for this Court to assert personal jurisdiction over SII. The single case cited by Finch recognizes that, in order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(2), a plaintiff must at least make out a *prima facie* case for the existence of personal jurisdiction. *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F.3d 790, 792-93 (6th Cir. 1996).

Jurisdiction may be found to exist generally, where a defendant's "continuous and systematic" conduct within the forum state renders that defendant amenable to any suit brought in that state, or specifically, in which the subject matter of the suit arises out of or is related to the defendant's contacts with the forum. *See, e.g.*, *Nationwide Mut. Ins. Co.*, 91 F.3d at 793.

---

[5] The characterization by Finch's counsel, Mr. Singer, that this Court's decisions with respect to his class certification motions were "precipitous[]" is insulting to the Court and contradicted by the record.

A valid jurisdictional assertion must satisfy Ohio's long-arm statute, Ohio Rev. Code § 2307.382, and due process. *Id.*

Due process requires that the exercise of personal jurisdiction comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The defendant must "purposefully avail[] itself of the privilege" of conducting business in the forum, such that it "should reasonably anticipate being haled into court there." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The test is whether the defendant had "minimum contacts" with the forum. *Nationwide Mut. Ins. Co.*, 91 F.3d at 794.

In the *Nationwide* case Finch relies on, Nationwide, an Ohio corporation located in Ohio, entered into an agreement regarding participation in a reinsurance pool with Tryg, a Danish corporation with its principal place of business in Denmark. The contracts obligated Tryg to remit funds to Ohio in certain circumstances and to maintain funds as collateral in an Ohio account. 91 F.3d at 791, 796. Nationwide sued Tryg for breach of contract an a declaratory judgment as to contractual obligations. *Id.* at 792. The District Court granted Tryg's motion to dismiss for lack of personal jurisdiction and the Sixth Circuit affirmed. The Court first held that there was no general jurisdiction over Tryg, even though it entered into contracts with an Ohio company. *Id.* at 793-94. "None of the agreements required Tryg International to send its representatives to Ohio to conduct any business in the state, and [its] performance under the agreements did not require it to conduct substantial activities in Ohio." *Id.* at 794. The Court also held that the mere existence of a contract with an Ohio citizen and remitting to or maintaining money in Ohio did not constitute minimum contacts for specific jurisdiction. *Id.* at 794-97.

As the Court's October 25, 2004 Order provided, Finch's proposed third amended complaint contained no basis for jurisdiction over SII, contrary to Fed. R. Civ. P. 8(a)(1). (Docket No. 113 at 1-2).  Finch's reply set forth two purported bases for the assertion of jurisdiction:  (1) SII, "through counsel, negotiated with attorneys and parties located in this jurisdiction with respect to the proposed settlement"; and (2) SII, "through the 'Settlement Administrator,' caused mailings of the notice of settlement, claim forms, and copies of the proposed settlement agreement, to be mailed within the Southern District of Ohio." (Reply, Docket No. 111 at 6).  These alleged contacts do not constitute a sufficient basis for this Court to exercise personal jurisdiction over SII.

SII has never had an office, owned property, solicited business, or sent agents for the purpose of soliciting business into the State of Ohio.  (Ex. 6, Declaration of Russell Firestone ("Firestone") ¶ 3).  Nor has SII sold or leased products or provided services to any customer in the State of Ohio.  (*Id.*).  Neither SII nor its counsel traveled to Ohio to negotiate the Settlement Agreement.  (Oparil Decl. ¶ 2).  Indeed, SII's officers had no direct contact or discussions with any of the other parties to the Settlement Agreement.  (Oparil Decl. ¶ 2).  Negotiations took place by telephone, usually from the Washington, DC office of SII's counsel, and the Settlement Agreement was signed on SII's behalf by James Harkess in the State of California.  (Oparil Decl. ¶ 2).  Contrary to Finch's argument, the mere fact that SII entered into an agreement with Ohio citizens is not a basis for personal jurisdiction.  *See, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); *Nationwide Mut. Ins. Co.*, 91 F.3d at 795.

The second basis on which Finch asks this Court to assert jurisdiction is that the Settlement Administrator mailed certain documents in this District.  (Docket No. 109 Ex. 4).  However, the Administrator was in no way acting as SII's agent or representative, nor did SII "cause" him to make any mailing.  (Oparil Decl. ¶ 3).  The Settlement Agreement provides that:

> **The represented investors or their counsel** shall create a Trust which shall be initially managed and maintained by Robert C. Krantz of Cincinnati, Ohio, an **independent Administrator who is acceptable and accountable to counsel for the Represented Investors**.  All payments called for to be paid to Investors shall be directed to the Administrator for deposit into a Trust Account.

(Docket No. 109 Ex. 2 ¶ 5, emphasis added).  The Administrator cannot be deemed an agent of SII.

The Settlement Agreement does not give SII any role in causing the Administrator to mail information to investors:

> Upon final execution of the Settlement Agreement, the Administrator shall notify all Unrepresented Investors of the terms of the settlement and shall allow each of them to submit a proof of claim and execute a release of claims similar to those executed by the Represented Investors.  All Represented Investors and all approved Unrepresented Investors (defined as the "Settling Investors") shall be paid such sums as are available for distribution by the Administrator pro-rata, based upon the total amount of any unreturned investment, exclusive of interest, as of January 1, 2003.  Such distributions shall be made by the Administrator from time to time as the Administrator deems appropriate.

(*Id.* ¶ 12).  There is no provision in the Settlement Agreement that provides SII with any role regarding the mailing.  SII did not draft, review or even have advance knowledge that the

Administrator had sent the notice.  (Oparil Decl. ¶ 3).  A mailing by an independent third-party cannot provide any basis to assert personal jurisdiction over SII.[6]

Accordingly, Finch has not set forth a *prima facie* case showing that SII has minimum contacts with Ohio such that personal jurisdiction exists.  Because granting Finch's motion for leave to amend would be a futile gesture, the motion should be denied.  *See, e.g.*, *Scott v. Fairbanks Capital Corp.*, 284 F. Supp. 2d 880, 885 (S.D. Ohio 2003).

## CONCLUSION

For all the foregoing reasons, Finch's motion for leave to file a third amended class action complaint should be denied.

Dated:  November 4, 2004                    Respectfully submitted,


  /s/ Dan L. Makee
DAN L. MAKEE (0029602)
McDonald Hopkins Co., LPA
Suite 2100
600 Superior Avenue, East
Cleveland, Ohio 44114-2653
Telephone:   (216) 348-5400
Facsimile:    (216) 348-5474
E-Mail:        dmakee@mcdonaldhopkins.com

*An Attorney for Intervenor Sanitec Industries, Inc.*

*Of Counsel:*

RICHARD J. OPARIL (D.C. Bar No. 409723)
Patton Boggs LLP
2550 M Street, NW
Washington, DC  20037
Telephone:  (202) 457-6000
Facsimile:   (202) 457-6315
E-Mail:       roparil@pattonboggs.com

---

[6]  Not exercising personal jurisdiction over SII would be reasonable given that Finch has intervened in actions in Delaware and the Northern District of Ohio, and that they would have appeared in the New Jersey foreclosure.  (Docket No. 111 at 7).

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Further Response Of Intervenor Sanitec Industries, Inc. To Show Cause Order was filed electronically with this Court on this 4th day of November, 2004 and that all parties will be served via the Court's electronic filing system except for William B. Singer, Esq., attorney for plaintiff Finch, who is being served on this same date via regular United States Mail at One Lytle Place, 621 East Mehring Way, #1609, Cincinnati, Ohio 45202.

    /s/ Dan L. Makee
DAN L. MAKEE (0029602)
McDonald Hopkins Co., LPA
Suite 2100
600 Superior Avenue, East
Cleveland, Ohio 44114-2653
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
E-Mail: dmakee@mcdonaldhopkins.com

#3816855