## SECURITY AGREEMENT

THIS SECURITY AGREEMENT made as of the 5th day of June, 2001 by and between SANITEC, LTD., a Delaware corporation (the "Company") and PLATINUM FUNDING CORP., as servicing agent, a New Jersey corporation ("Platinum").

### W I T N E S S E T H:

WHEREAS, the Company and Platinum have or are about to enter into a Factoring Agreement, of even date herewith (the "Factoring Agreement") and intend, from time to time after the date hereof, to enter into one or more Purchase and Sale Agreements (the "Account Agreements") pursuant to which Platinum will purchase certain accounts receivable billed to customers of the Company (such accounts receivable, together with the proceeds thereof, being hereinafter referred to as the "Accounts Receivable") on the basis of, and in reliance upon, the representations, warranties and covenants of the Company contained in the Account Agreements (the "Representations"); and

WHEREAS, it is a condition precedent to the obligation of Platinum to enter into the Factoring Agreement and the Account Agreements and to purchase Accounts Receivable pursuant thereto that the Company shall have entered into this Security Agreement for the purpose of securing the performance of the Representations.

NOW, THEREFORE, to induce Platinum to enter into the Factoring Agreement and the Account Agreements and purchase Accounts Receivable pursuant thereto, and in consideration thereof and for Ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which being hereby acknowledged, the parties hereto agree as follows:

1. <u>Security Interest.</u> The Company hereby grants, bargains, sells, assigns, transfers and pledges to Platinum, its successors and assigns, a security interest (the "Security Interest") in all of the assets of the Company set forth on Exhibit A attached hereto and made a part hereof, together with any and all proceeds thereof (the "Collateral").

2. <u>Obligations.</u> This Agreement and the Security Interest shall secure the following obligations (the "Obligations"):

(a) Any and all obligations of the Company under the Account Agreements (but not the payment of the Accounts Receivables purchased pursuant thereto) or under any other agreement or instrument executed and delivered pursuant thereto; and

(b) Any and all other liabilities and obligations of every kind and nature whatsoever of the Company to Platinum, whether such liabilities and obligations be direct

or indirect, absolute or contingent, secured or unsecured, now existing or hereafter arising or acquired, due or to become due.

3. <u>Financing Statements and Other Action.</u> The Company will do all lawful acts which Platinum deems necessary or desirable to protect the Security Interest or otherwise to carry out the provisions of this Agreement, including, but not limited to, the execution of Uniform Commercial Code financing, continuation, amendment and termination statements and similar instruments and the procurement of waivers and disclaimers of interest in the Collateral by the owners of any real estate on which the Collateral is located. The Company irrevocably appoints Platinum as its attorney-in-fact, coupled with an interest, during the term of this Agreement to do all acts which it may be required to do under this Agreement.

4. <u>Place of Business.</u> The Company warrants that its principal place of business, chief executive office and the location where the records concerning its accounts and contract rights are located are as described in the address for notices of the Company set forth in Paragraph 17 to this Security Agreement. The Company will supplement the foregoing to add the addresses where any Collateral is located when and as the same becomes subject to the Security Interest. The Company will notify Platinum promptly of the addition or discontinuance of any place of business or any change in the information contained in this Section 4. None of the Collateral shall be removed from the locations specified herein, as from time to time supplemented, unless Platinum is given thirty (30) days prior written notice of such removal, which notice shall state the location or locations to which said Collateral will be removed. The Company warrants that all of the Collateral is and shall continue to be located at the locations set forth herein or such other locations of which Platinum receives notice in accordance with this Section 4.

5. <u>Encumbrances.</u> The Company warrants that it has title to the Collateral purportedly owned by it and that there are no sums owed or claims, liens, security interests or other encumbrances against the Collateral other than as set forth in Exhibit A attached hereto and made a part hereof. The Company will notify Platinum of any lien, security interest or other encumbrance against the Collateral securing any obligation of the Company, will defend the Collateral against any claim, lien, security interest or other encumbrance adverse to Platinum, except for liens having priority thereover as set forth on Exhibit B, attached hereto and made a part hereof, and will not create, incur, assume, or suffer to exist any lien, security interest or other encumbrances against the Collateral, whether now owned or hereafter acquired, except:

(a) liens in favor of Platinum and such other liens as are set forth on Exhibit B attached hereto and made a part hereof;

(b) liens for taxes or assessments or other government charges or levies if not yet due and payable or, if due and payable, if they are being contested in good faith

2

by appropriate proceedings and for which appropriate reserves have previously been delivered by the Company to Platinum;

(c) liens imposed by law, such as mechanics', materialmen's, landlords', warehousemen's, and carriers' liens, and other similar liens, securing obligations incurred in the ordinary course of business, which are not past due for more than 30 days or which are being contested in good faith by appropriate proceedings, and for which appropriate reserves have been previously delivered to Platinum;

(d) liens under workers' compensation, unemployment insurance, Social Security or similar legislation;

(e) liens, deposits, or pledges to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases, public statutory obligations, surety, stay, appeal, indemnity, performance, or other similar bonds, or other similar obligations arising in the ordinary course of business;

(f) judgment and other similar liens arising in connection with court proceedings, provided that the execution or other enforcement of such liens is effectively stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings;

(g) easements, right-of-way, restrictions, and other similar encumbrances which, in the aggregate, do not materially interfere with the occupation, use, and enjoyment by the Company of the property or assets encumbered thereby in the normal course of its business or materially impair the value of the property subject thereto; and

(h) purchase-money liens on any property hereafter acquired or the assumption of any lien on property existing at the time of such acquisition (and not created in contemplation of such acquisition), or a lien incurred in connection with any conditional sale or other title retention agreement or a capital lease; provided that:

(i) any property subject to any of the foregoing is acquired by the Company in the ordinary course of its business and the lien on any such property attaches to such asset concurrently or within 90 days after the acquisition thereof;

(ii) the obligation secured by any lien so created, assumed, or existing shall not exceed 100% of the lesser of (the cost or the fair market value as of the time of acquisition of the property covered thereby to the Company; and

(iii) each such lien shall attach only to the property so acquired and fixed improvements thereon.

6. <u>Maintenance of Collateral.</u> The Company shall preserve the Collateral for the benefit of Platinum. Without limiting the generality of the foregoing, the Company shall:

(a) make all such repairs, replacements, additions and improvements to its equipment as in its judgment are necessary to permit such business to be properly and advantageously conducted at all times;

(b) maintain and preserve its inventory except as sold in the ordinary course of business;

(c) preserve all beneficial contract rights to the extent commercially reasonable;

(d) in conjunction with, and at the direction of, Platinum, take commercially reasonable steps to collect all accounts; and

(e) pay all taxes, assessments or other charges on the Collateral when due, unless the amount or validity of such taxes, assessments or charges are being contested in good faith by appropriate proceedings and reserves with respect thereto in conformity with generally accepted accounting principles have been provided on the books of the Company.

Nothing contained herein shall be construed to prohibit the Company from buying and selling equipment and inventory in the ordinary course of business; provided, however, that the Company will not sell equipment where either the adjusted basis of such equipment determined in accordance with generally accepted accounting principles or the sales price of such equipment exceeds, for any 12 month period, $5,000 in any individual transaction or $20,000 in the aggregate.

7. <u>Additional Provisions Concerning the Collateral.</u>

(a) The Company authorizes Platinum to file, without the signature of the Company, where permitted by law, one or more financing or continuation statements, and amendments thereto, relating to the Collateral.

(b) The Company irrevocably appoints Platinum as its attorney-in-fact (such power of attorney being coupled with an interest) and proxy, with full authority in the place and stead of the Company and in its name or otherwise, from time to time in Platinum's discretion, to take any action or execute any instrument which Platinum may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation: (i) to obtain and adjust insurance required to be paid to Platinum pursuant to Section 8 hereof; (ii) to ask, demand, collect, sue for, recover, compound,

4

receive, and give acquittance and receipts for moneys due and to become due under or in respect or any of the Collateral; (iii) to receive, endorse, and collect any checks, drafts or other instruments, documents, and chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign the Company's name on any invoice or bill of lading relating to any account, on drafts against customers, on schedules and assignment of accounts, on notices of assignments, financing statements and other public records, on verification of accounts and on notices to customers (including notices directing customers to make payment directly to Platinum); (v) if a Default (as hereinafter defined) has occurred and is continuing, to notify the postal authorities to change the address for delivery of its mail to an address designated by Platinum, to receive, open and process all mail addressed to the Company, to send requests for verification of accounts to customers; and (vi) to file any claims or take any action or institute any proceeding which Platinum may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Platinum with respect to any of the Collateral. The Company ratifies and approves all acts of such attorney; and so long as such attorney acts in good faith and without gross negligence, such attorney shall have no liability to the Company for any act or omission thereas.

(c) If the Company fails to perform any agreement contained herein, Platinum may itself perform, or cause performance of, such agreement or obligation, and the costs and expenses of Platinum incurred in connection therewith shall be payable by the Company and shall be fully secured hereby.

(d) The powers conferred upon Platinum hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon Platinum to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by Platinum hereunder, Platinum shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

(e) Anything herein to the contrary notwithstanding, (i) the Company shall remain liable under any contracts and agreements relating to the Collateral, to the extent set forth therein, to perform all of its obligations thereunder to the same extent as if this Security Agreement had not been executed; (ii) the exercise by Platinum of any of its rights hereunder shall not release the Company from any of its obligations under the contracts and agreements relating to the Collateral; and (iii) Platinum shall not have any obligation or liability by reason of this Security Agreement under any contracts and agreements relating to the Collateral, nor shall Platinum be obligated to perform any of the obligations or duties of the Company thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

8. <u>Insurance.</u> The Company shall maintain insurance covering the Collateral with financially sound and reputable insurers satisfactory to Platinum against such risks as are

5

customarily insured by a business in the same or similar industry and similarly situated for an amount not less than the full replacement value of such Collateral. All such insurance policies covering property on and after the date such property becomes subject to the Security Interest shall be written so as to be payable in the event of loss to Platinum and shall provide for at least 30 days prior written notice to Platinum prior to cancellation or modification of each such policy. At the request of Platinum, all insurance policies covering property subject to the Security Interest shall be delivered to and held by Platinum. If, while any Obligations are outstanding, any proceeds in excess of $5,000 with respect to any casualty loss are paid to Platinum under such policies on account of such casualty loss, and there is no breach by the Company of any representations, or default by the Company in the performance of any covenant herein or in the Factoring Agreement contained (any of the foregoing being hereinafter referred to as an "Event of Default") which is continuing, Platinum will pay over such proceeds in whole or in part to the Company, for the purpose of repairing or replacing the Collateral destroyed or damaged, any such repaired or replaced Collateral being secured hereby. If an Event of Default has occurred and is continuing, Platinum may apply the proceeds in its discretion to any of the Obligations. All proceeds less than or equal to $5,000 with respect to any casualty loss shall be paid to the Company, to be used by the Company to replace or repair the Collateral destroyed or damaged, except that if an Event of Default shall have occurred, then Platinum shall apply the proceeds in its discretion to any of the Obligations. Platinum is hereby appointed during the term of this Agreement as irrevocable attorney-in-fact to collect the proceeds of such insurance, to settle any claims with the insurers in the event of loss or damage, to endorse settlement drafts and, upon an Event of Default under this Agreement, to cancel, assign or surrender any insurance policies.

9. Fixtures. It is the intention of the parties hereto that none of the equipment, machinery or other property securing the Obligations hereunder shall become or constitute fixtures.

10. Default. (a) (i) If breach or default shall be made in the due performance or observance of any provision of this Agreement and such breach or default shall continue for a period of 5 days after written notice thereof shall have been received by the Company from Platinum; or (ii) an Event of Default, as defined in Section 8, shall have occurred and shall continue for a period of 5 days after written notice thereof shall have been received by the Company from Platinum (each of the foregoing being hereinafter referred to as a "Default", then upon the occurrence of any such Default or at any time or times thereafter, unless such Default shall have been cured within any applicable grace period, or waived in writing by Platinum, Platinum shall have all of the rights and remedies of a secured party under the Uniform Commercial Code and shall have full power and authority to sell or otherwise dispose of the Collateral or any part thereof. Any such sale or other disposition, subject to the provisions of applicable law, may be by public or private proceedings and may be made by one or more contracts, as a unit or in parcels, at such time and place, by such method, in such manner and on such terms as

Platinum may determine. Except as required by law, such sale or other disposition may be made without advertisement or notice of any kind or to any third party or third person. Platinum will, however, notify the Company of the time and place of such sale or other disposition and such notice will be deemed to have been sufficiently given if such notice is telegraphed, cabled, mailed postage prepaid, sent by courier or telefaxed at least 10 days before the time of such sale or other disposition to each person entitled thereto at each such person's address or telefax number, as the case may be, as specified in Section 17 below. To the extent permitted by applicable law, Platinum may buy any or all of the Collateral upon any sale thereof. To the extent permitted by applicable law, upon any such sale or sales, the Collateral so purchased shall be held by the purchaser absolutely free from any claims or rights of whatever kind or nature, including any equity of redemption or any similar rights, all such equity of redemption and any similar rights being hereby expressly waived and released by the Company. In the event any consent, approval or authorization of any governmental agency shall be necessary to effectuate any such sale or sales, the Company each shall execute, as necessary, all applications or other instruments as may be required. After deducting all reasonable costs and expenses of collection, custody, sale or other disposition or delivery (including legal costs and reasonable attorneys' fees) and all other charges due against the Collateral (including any charges of the type described in Section 11 below), the residue of the proceeds of any such sale or other disposition shall be applied to the payment of the Obligations, except as otherwise provided by law or directed by any court of competent jurisdiction thereof, and any surplus shall be returned to the Company, except as otherwise provided by law or any such court. The Company shall be liable for any deficiency in payment of the Obligations, including all reasonable costs and expenses of collection, custody, sale or other disposition or delivery and all other charges due against the Collateral, as hereinbefore enumerated.

      (b) Upon the occurrence of a Default and at any time or times thereafter, subject to the provisions of applicable law, Platinum may take proceedings in any court of competent jurisdiction for the appointment of a receiver (which term shall include a receiver-manager) of the Collateral or of any part thereof or may by instrument in writing appoint any person to be receiver of the Collateral or any part thereof and may remove any receiver so appointed by Platinum and appoint another in his stead; and any such receiver appointed by instrument in writing shall have the power (i) to take possession of the Collateral or any part thereof , (ii) to carry on the business of the Company, (iii) to borrow money on the security of the Collateral in priority to this Agreement required for the maintenance, preservation or protection of the Collateral or any part thereof or for the carrying on of the business of the Company, and (iv) to sell, lease or otherwise dispose of the whole or any part of the Collateral at public auction, by public tender or by private sale, either for cash or upon credit, at such time and upon such terms and conditions as the receiver may determine; provided that any such receiver shall be deemed the agent of the Company and Platinum shall not be in any way responsible for any misconduct or negligence of any such receiver except for willful misconduct or gross negligence.

11. <u>Payment of Taxes, Charges, Etc.</u> Platinum, at its option, after notice to the Company, may discharge any taxes, charges, assessments, security interests, liens or other encumbrances (except those permitted by Section 5 of this Agreement) upon the Collateral or otherwise protect the value thereof. All such expenditures incurred by Platinum shall become payable by the Company to Platinum upon demand, shall bear interest at the rate of 18% per annum from the date incurred to the date of payment, and shall be secured by the Collateral.

12. <u>Duties with Respect to Collateral.</u> Platinum shall have no duty to the Company with respect to the Collateral other than the duty to use reasonable care in the safe custody of any of the Collateral in its possession. Without limiting the generality of the foregoing, Platinum, although it may do so at its option, shall be under no obligation to the Company to take any steps necessary to preserve rights in the Collateral against other parties.

13. <u>Waivers.</u> To the extent permitted by law, the Company hereby waives demand for payment, notice of dishonor or protest and all other notices of any kind in connection with the obligations except notices required hereby, by law or by any other agreement between the Company and Platinum. Platinum may release, supersede, exchange or modify any Collateral or security which it may from time to time hold and may release, surrender or modify the liability of any third party without giving notice hereunder to the Company. Such modifications, changes, renewals, releases or other actions shall in no way affect any of the Obligations or the Company's obligations hereunder.

14. <u>Transfer Expenses, etc.</u> The Company will pay, indemnify and hold harmless Platinum from and against all costs and expenses (including taxes, if any) arising out of or incurred in connection with any transfer of Collateral into or out of the name of Platinum and all reasonable costs and expenses, including reasonable legal fees, of Platinum arising out of or incurred in connection with this Agreement; provided, however, that the Company shall not be responsible for expenses arising out of or incurred as a result of willful misconduct by Platinum.

15. <u>Termination.</u> This Agreement and the Security Interest shall terminate upon the termination of the Factoring Agreement; provided that all Obligations have been paid or discharged in full. Platinum will, upon such termination, deliver to the Company appropriate Uniform Commercial Code termination statements with respect to the Collateral so released from the Security Interest, for filing with each filing office with which Uniform Commercial Code financing statements have been filed by Platinum.

16. <u>Modification.</u> This Agreement may not be modified or amended without the prior written consent of each of the parties hereto.

17. <u>Notices.</u> Except as otherwise provided in this Agreement, all notices and other communications hereunder shall be deemed to have been sufficiently given when mailed, postage prepaid, by certified or registered mail, sent by courier or telefaxed, return receipt requested, or confirmation of receipt requested in the case of a telefax, and the sender shall have received such return receipt or confirmation, such notices or communications to be, addressed as follows:

| | |
|---|---|
| If to Platinum, to: | Platinum Funding Corp.<br>Two University Plaza, Suite 206<br>Hackensack, New Jersey 07601<br>Attn: Mark D. Weinberg<br>Telefax Number: (201) 487-6287 |
| If to the Company, to: | Sanitec, Ltd.<br>23 Fairfield Place<br>West Caldwell, New Jersey 07006<br>Attn: Joseph Delloiacovo<br>Telefax Number: (973) 227-9048 |

or at such other address or telefax number, as the case may be, as the party to whom such notice or demand is directed may have designated in writing to the other party hereto by notice as provided in this Section 17. Each of the parties hereto shall have the right to rely on as an original any notice given hereunder by telefax as aforesaid.

18. <u>Rights; Merger.</u> No course of dealing between the Company and Platinum, nor any delay in exercising, on the part of Platinum, any right, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law or in equity, including, without limitation, the rights and remedies of a secured party under the Code. It is understood and agreed that all understandings and agreements heretofore had between the parties, if any, with respect to the subject matter hereof are merged into this Security Agreement, which alone fully and completely expresses their agreement.

19. <u>Governing Law, Binding Effect, Etc.</u> This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the State of New Jersey. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including any other holder or holders of any obligations and may be executed in two or more counterparts, each of which shall together constitute one and the same agreement.

20. <u>Severability.</u>  The invalidity or unenforcability of any provision hereof shall in no way affect the validity or enforceability of any other provision hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement as of the day and year first above written.

SANITEC, LTD.

By: _____
Name: Joseph Delloiacovo
Title:  President

securityagr

EXHIBIT A TO SECURITY AGREEMENT
AND UCC-1 FINANCING STATEMENT

SANITEC, LTD. ("Debtor") hereby grants to Platinum a security interest in the following:

1. All "Accounts" (as such term is defined in Section 9-106 of the Uniform Commercial Code ("UCC")) now owned or hereafter acquired by Debtor, whether or not now or hereafter purchased by Platinum, and including, without limitation, all accounts receivable, book debts, and other forms of obligations (to the extent not constituting obligations evidenced by Chattel Paper, Documents, or Instruments) now owned or hereafter received or acquired by or belonging or owing to Debtor, whether or not now or hereafter purchased by Platinum (including without limitation, under any trade name, style, or division thereof) whether arising out of goods sold or services rendered by Debtor or from any other transaction, whether or not the same involves the sale of goods or services by Debtor and all of Debtor's rights in, to, and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services, and all of Debtor's rights to any goods represented by any of the foregoing (including without limitation unpaid seller's rights of rescission, replevin, reclamation, and stoppage in transit and rights to returned, reclaimed, or repossessed goods) and all monies due or to become due to Debtor under all purchase orders and contracts for the sale of goods or the performance of services or both by Debtor (whether or not yet earned by performance on the part of Debtor or in connection with any other transaction) now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any person with respect to any of the foregoing, whether or not any of the foregoing is included within the definition of "accounts" in the UCC and whether or not any of the foregoing is now or hereafter purchased by Platinum.

2. All "Chattel Paper" (as such term is defined in Section 9-105(1)(b) of the UCC) now owned or hereafter acquired by Debtor.

3. All contract undertakings, franchise agreements, or other agreements (to the extent not constituting Chattel Paper, Documents, or Instruments) in or under which Debtor may now or hereafter have any right, title or interest, including without limitation with respect to an Account, any agreement relating to the terms of payment, or the terms of performance thereof (collectively "Contracts").

4. All "Documents" (as such term is defined in Section 9-105(1)(f) of the UCC) now owned or hereafter acquired by Debtor.

5. All "Equipment" (as such term is defined in Section 9-109(2) of the UCC) now or hereafter owned or acquired by Debtor, and including, without limitation, all machinery,

11

equipment, furnishings, vehicles, and computers and other electronic data-processing and other office equipment, any and all additions, substitutions, and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment, and accessories installed thereon or affixed thereto.

6. All "Fixtures" (as such term is defined in Section 9-313 (1) (a) of the UCC) now or hereafter owned or acquired by Debtor, and including, without limitation, (regardless of where located) all of the fixtures, systems, machinery, apparatus, equipment, and fittings of every kind and nature whatsoever and all appurtenances and additions thereto and substitutions or replacements thereof, now or hereafter attached or affixed to or constituting a part of, or located in or upon, real property wherever located, including without limitation all heating, electrical, mechanical, lighting, lifting, plumbing, ventilating, air-conditioning, air cooling, refrigerating, food preparation, loading and unloading, incinerating, communication and power systems, machinery, apparatus, and equipment, signs, escalators, elevators, boilers, switchboards, sprinkler and other fire prevention and extinguishing fixtures, and all engines, motors, dynamos, machinery, pipes, pumps, tanks, conduits, and ducts constituting a part of any of the foregoing, together with all right, title and interest of Debtor in and to all extensions, improvements, betterments, renewals, substitutes and replacements of, and all additions and appurtenances to, any of the foregoing property and all conversions of the security constituted thereby immediately upon any acquisition or release thereof or any such conversion, as the case may be.

7. All "General Intangibles" (as such term is defined in Section 9-106 of the UCC) now owned or hereafter acquired by Debtor, and including without limitation all right, title and interest that Debtor may now or hereafter have in or under any Contract, all customer lists, trademarks, patents, rights in intellectual property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable) technical information, procedures, designs, knowledge, know-how, software, databases, data, skill, expertise, recipes, experience, processes, models, drawings, materials and records, goodwill (including without limitation the goodwill associated with any trademark, trademark registration or trademark licensed under any trademark license), claims in or under insurance policies (including without limitation any unearned premiums), uncertificated securities, deposit accounts, rights to receive tax refunds and other payments, and rights of indemnification.

8. All "Instruments" (as such term is defined in Section 9-105 (1) (i) of the UCC) now owned or hereafter acquired by Debtor, including, without limitation, all notes, certificated securities, and other evidences of indebtedness, to the extent not constituting Chattel Paper.

9. All "Inventory" (as such term is defined in Section 9-109 (4) of the UCC) now or hereafter owned or acquired by Debtor, and including without limitation all inventory, merchandise, goods, and other personal property that are held by or on behalf of Debtor for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process, or materials used or consumed or to be used or consumed in Debtor's business or the processing, packaging, promotion, delivery or shipping of the same, and all finished goods.

10. All other goods and personal property of Debtor whether tangible or intangible and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, Debtor and wherever located, including without limitation all deposit accounts, cash, and any beneficial interest of Debtor under any trust.

11. To the extent not otherwise included, all proceeds and products of the foregoing (and proceeds and products of proceeds and products) in whatever form and whether such proceeds and products arise before or after the commencement of any case under the United States Bankruptcy Code by or against Debtor, including, without limitation, all payments under insurance whether or not Platinum is the loss payee thereof, all proceeds of any governmental taking, and any indemnity, warranty, letter of credit (including the right to draw on such letter of credit), or guaranty payable by reason of any default under, loss of, or damage to or otherwise with respect to any of the foregoing.

SANITEC, LTD.

By: _____
Name: Joseph Delloiacovo
Title: President

13

EXHIBIT "B"

<u>Permitted Liens</u>
None

14

## Acknowledgment

STATE OF New Jersey
COUNTY OF Bergen County : SS:

On this 5 day of ~~May~~ June, 2001, before me personally came Joseph Delloiacovo, to me known, who being duly sworn, did depose and say that he resides at 32 Dogwood Trail, Randolph, New Jersey 07869 and that he is the President of Sanitec, Ltd., a Delaware corporation, the corporation described in and which executed the foregoing instrument, and acknowledged that he executed the same by authority of the board of directors of said corporation for the uses and purposes in said corporation set forth.

_[signature]_
Notary Public

MARTHA MINERVINI
A Notary Public of New Jersey
My Commission Expires 10/05/2005